539 A.2d 1113

**Edward P. NAST et ux.**

v.

**Lois Ann LOCKETT et al.**

**No. 91, Sept. Term, 1987.**

Court of Appeals of Maryland.

April 11, 1988.

344

Howard J. Schulman, Baltimore, for appellants.

Joseph F. Lavin (Rollins, Smalkin, Richards & Mackie and Robert W. Fox, all on brief), Gertrude C. Bartel (Nancy Felix Mangan and Kramon & Graham, P.A., all on brief), Baltimore, for appellees.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

CHARLES E. ORTH, Jr., Judge, Specially Assigned.

This appeal revolves around the propriety of submitting to the trier of fact in an automobile accident case the allowance of punitive damages against a drinking driver.

## I

Three cars were involved in the accident. One was driven by Lois Ann Lockett, the second by Charles Carroll Houck, and the third by Edward P. Nast. About 8:30 p.m. on 17 February 1984, Lockett was heading south in the southbound lane of York Road near its intersection with Lambourne Road in Baltimore County, Maryland. Nast was about 10 car lengths behind her. Houck was heading north in the right curb northbound lane of York Road, south of the Lockett car. Lockett tried to make a U-turn from the southbound lane of York Road, across the two northbound lanes, so as to be able to proceed north on York Road. She was unable to complete the turn and came to a stop facing the northbound curb. She began to back up so she could complete the turn. Houck continued north without braking or deviating from his course and collided with the right side of Lockett's car. Nast testified that when Lockett started to make her U-turn, Houck's car was about 300 feet away, but another witness, an off duty Baltimore City police officer, who was following Houck, estimated the distance between the Houck and Lockett cars to be 15 or 20 feet when he first observed them before the collision. He said:

"It had just started to drizzle," and suggested that Houck was unable to stop "due to the wet conditions on the roadway." Houck did not recall the details of the accident. He testified:

[A]ll of a sudden instantly there was an automobile in front of me. I had no alternative. There was nothing I could do. It happened within a second to two seconds. I couldn't get out of the way of that car. I couldn't avoid it.

He did not know where the car he struck came from, in which direction it had been traveling ("the car was coming towards me,") or what part of the car he hit. He vaguely recalled hitting a second car. Houck's car careened off of Lockett's car into the southbound lane of York Road and struck Nast's car. Fortunately there were no fatalities, but there were personal injuries and property damage.

Nast's fiancee, now his wife, was a passenger in his car. They entered suit in the Circuit Court for Baltimore City seeking compensatory and punitive damages from Lockett and Houck. The trial judge did not permit the matter of punitive damages to go to the jury. The jury awarded compensatory damages to the Nasts against Lockett and Houck. The Nasts appealed to the Court of Special Appeals. We certified the case to us on our own motion before decision by that court. The primary question is whether the trial court erred in keeping the matter of punitive damages from the consideration of the jury.

## II

"Compensatory damages are such as will compensate the injured party for the injury sustained, and nothing more; such as will simply make good or replace the loss caused by the wrong or injury." Black's Law Dictionary 352 (5th ed. 1979). In other words, they are "damages awarded to a person as compensation, indemnity, or restitution for harm sustained by him." *Id. See McAlister v. Carl*, 233 Md. 446, 451–457, 197 A.2d 140 (1964).

Punitive or exemplary damages are damages on an increased scale, awarded not as the measure of actual loss suffered but "as punishment for outrageous conduct and to deter future transgressions." Black at 352.[1] *See First Nat'l Bank v. Fid. & Dep. Co.*, 283 Md. 228, 232, 389 A.2d 359 (1978); *General Motors Corp. v. Piskor*, 281 Md. 627, 638, 381 A.2d 16 (1977).

We held in *Shell Oil Co. v. Parker*, 265 Md. 631, 644, 291 A.2d 64 (1972), that there must be at least a showing of compensable injury, that is, an award of compensatory damages, before a recovery of punitive damages is allowed.[2] In other words, to support the allowance of punitive damages, the negligence of the defendant must be established and damages awarded the plaintiff to compensate him for the actual damages incurred by the negligent conduct of the defendant. What we say herein about punitive damages is within that frame of reference.

We start with the generally accepted rule that "punitive damages are not recovered as a matter of right, even though the facts of the case may be such as to make their allowance proper, but rather, that their allowance rests in the sound discretion of the [trier of fact, be it court or jury]." Annot., Intoxication of Automobile Driver as Basis for Awarding Punitive Damages, 65 A.L.R.3d 656, 660-661 (1975). Whether the trier of fact is to be permitted to exercise that discretion is a matter of law for the trial court. In other words, the sufficiency of the evidence to submit the question of punitive damages to the trier of fact is a question of law.

If a court's ruling on any question of law is not right, it is wrong. When a ruling involves the exercise of discretion, the range within which a ruling may be right is equal to

---

1. *See Shell Oil Co. v. Parker*, 265 Md. 631, 637, 291 A.2d 64 (1972), for a concise history of the recognition of punitive damages in the law.

2. In *First Nat'l Bank v. Fid. & Dep. Co.*, 283 Md. 228, 232-243, 389 A.2d 359 (1978), we declared that insurance protection against punitive damages is not barred in Maryland by public policy.

the permitted range of discretion. But the law gives no judge or court discretion to make a wrong ruling.

*Boyd v. State,* 22 Md.App. 539, 323 A.2d 684, Powers, J., dissenting at 554, 323 A.2d at 693, *cert. denied,* 272 Md. 738 (1974). So the question before us is whether the trial court here was right or wrong in keeping from the jury the matter of the allowance of punitive damages as to Lockett and as to Houck.

■ The basic rule for the entitlement of punitive or exemplary damages is that there be actual malice. That is,
 there must be an element of fraud, or malice, or evil
 intent, or oppression entering into and forming part of
 the wrongful act.

*Philadelphia, W. & B. R.R. Co. v. Hoeflich,* 62 Md. 300, 307, 50 Amer.Rpt. 223 (1884), quoted in *Davis v. Gordon,* 183 Md. 129, 133, 36 A.2d 699 (1944). The rule held fast in this State until our decision in *Smith v. Gray Concrete Pipe Co.,* 267 Md. 149, 297 A.2d 721 (1972). Until that time we had never approved an award of punitive damages in a motor vehicle case. *Id.* at 162, 297 A.2d 721. In *Smith,* however, we fashioned a standard for the allowance of punitive damages in such cases. We looked to the crime of manslaughter by automobile. The statute creating the crime, now codified in Maryland Code (1957, 1987 Repl.Vol.) Art. 27, § 388, provides in pertinent part:

 Every person causing the death of another as the result
 of the driving ... of an automobile ... in a grossly
 negligent manner, shall be guilty of a misdemeanor to be
 known as "manslaughter by automobile...."

We observed that our decisions have interpreted this statute "as requiring proof of gross negligence, which has been defined in this context as 'a wanton or reckless disregard for human life.'" 267 Md. at 167, 297 A.2d 721. We said:

 We regard a "wanton or reckless disregard for human
 life" in the operation of a motor vehicle, with the known
 dangers and risks attendant to such conduct, as the legal
 equivalent of malice.

*Id.* at 168, 297 A.2d 721. We considered it to be "a standard which, although stopping just short of wilful or intentional injury, contemplates conduct which is of an extraordinary or outrageous character." *Id.* But we found that it was "both a functional and definitive test which ... enjoys the virtue of having been frequently applied in this State [in automobile manslaughter cases]." *Id.* We asserted:

> And if, as a test, it has been regarded as adequately stringent to serve as a basis for possible imprisonment, then, surely, there appears to be no valid reason for deeming it too liberal for imposing civil sanctions.

*Id.* We held "that it is the standard by which claims for exemplary damages arising out of motor vehicle operation are to be tested." *Id.* We iterated the test in *H & R Block, Inc. v. Testerman,* 275 Md. 36, 47, 338 A.2d 48 (1975).[3] Thus, the test in a civil automobile accident action for the submission of the award of punitive damages to the trier of fact is the same as the test in a criminal prosecution of manslaughter by automobile for the submission of the question of the guilt of the accused to the trier of fact. In each case, as a matter of law, the evidence must be sufficient (in the former by a preponderance thereof, in the latter beyond a reasonable doubt) to establish that the defendant was grossly negligent, that is, that he had a wanton or reckless disregard for human life in the operation of an automobile. The legal threshold that must be crossed before the trier of fact is given discretion to award punitive damages is a stringent one. It deals with the state of mind of the defendant driver. If the driver intended death or injury, there is actual malice, and punitive damages may be awarded. If it cannot be shown that the

---

**3.** In *H & R Block, Inc. v. Testerman,* 275 Md. 36, 47, 338 A.2d 48 (1975), we refused to extend the *Smith* standard to torts arising out of a contractual relationship. In *Miller Building Supply v. Rosen,* 305 Md. 341, 355, 503 A.2d 1344 (1986), involving a contract, we declined to create a fraud exception to the rule that actual malice must be proved to support punitive damages.

driver intended death or injury, but it can be shown that he or she had a reckless lack of concern for whether others might be killed or seriously injured, i.e. had a wanton or reckless disregard for human life, the law considers that to be the equivalent of intending the harm, and punitive damages may be awarded. Only conduct that is of an extraordinary or outrageous character will be sufficient to imply this state of mind, and thus suffice as the legal equivalent of actual malice. Simple negligence will not be sufficient— even reckless driving may not be enough. It is not reckless driving that allows punitive damages; it is the reckless disregard for human life. Reckless driving may be a strong indicator, but unless it is of an extraordinary or outrageous character, it will ordinarily not be sufficient.

We did not have occasion in *Smith* to apply the test we enunciated therein. In that case the question of punitive damages in motor vehicle cases was certified to us by the United States District Court for the Eastern District of Virginia pursuant to Maryland's Uniform Certification of Questions of Law Act and did not call for the application of the test to particular facts. Until the case we now decide, we have not had the opportunity to apply it. Now, we must determine whether Lockett and Houck were not merely negligent in the operation of their respective automobiles, as they have been found to be, but also grossly negligent, so as to embrace a wanton or reckless disregard for human life, thereby supplying the legal equivalent of actual malice. This determination must be made in the light of evidence adduced at the trial tending to show that Lockett and Houck had consumed alcoholic beverages shortly before their fortuitous meeting on York Road, and evidence regarding their condition as a result of their drinking.

### III

In Maryland it is a misdemeanor for a person to drive or attempt to drive any vehicle while

1) intoxicated;

2) under the influence of alcohol;

3) so far under the influence of any drug, any combination of drugs, or a combination of one or more drugs and alcohol that he cannot drive a vehicle safely;

4) under the influence of any controlled dangerous substance, as statutorily defined, if the person is not entitled to use the controlled dangerous substance under the laws of this State.

Maryland Code (1977, 1987 Repl. Vol.) § 21–902 of the Transportation Article (TR). It is also a misdemeanor known as "homicide by motor vehicle while intoxicated" when a person causes "the death of another as the result of the person's negligent driving . . . of a motor vehicle while intoxicated. . . ." Md.Code, Art. 27, § 388A(b).

The legislature has provided guidance to aid the prosecution of all of these misdemeanors which involve drinking drivers. A chemical test of a driver's blood or breath may be administered under certain conditions for the purpose of determining the alcohol content of his blood. Maryland Code (1974, 1984 Repl.Vol.) § 10–302 of the Courts and Judicial Proceedings Article (CJ). Except when the death of another person results from a motor vehicle accident, a person may not be compelled to submit to a chemical analysis, and no inference or presumption concerning either guilt or innocence arises because of the refusal to submit. CJ § 10–309(a).[4] Prior to the middle of 1986, the fact of refusal to submit to chemical analysis was not admissible in evidence at the trial of a drinking driver. By Acts 1986, ch. 652, effective 1 July 1986, such evidence was made admissible. CJ § 10–309(a). "The evidence of the chemical analysis does not limit the introduction of other evidence bearing upon whether the defendant was intoxicated or whether the

---

**4.** The provisions of Maryland Code (1974, 1984 Repl.Vol.) Art. 10–309(a) of the Courts and Judicial Proceedings Article do not limit the provisions of the vehicle laws regarding the consequences of refusal to submit to a chemical test nor does it preclude or limit the admissibility of evidence of chemical analysis in any prosecution other than for a violation of § 21–902 of the Transportation Article. CJ § 10–309(b) and (c).

defendant was driving while under the influence of alcohol." CJ § 10–308.

In a proceeding in which a person is charged with homicide by motor vehicle while intoxicated (Code, Art. 27, § 388A(b)) or with the misdemeanors created by TR § 21–902, the amount of alcohol in a person's breath or blood as shown by chemical analysis is admissible in evidence. Art. 27, § 388A(a); CJ § 10–307(a). The legislature has prescribed that the amount of alcohol in a person's breath or blood has the following effects. If, at the time of testing, there was in the person's blood by weight of alcohol

a) 0.13% or more, it shall be prima facie evidence that the person was intoxicated, subsection (e);

b) 0.08% or more, it shall be prima facie evidence that the person was driving while under the influence of alcohol, subsection (d);

c) 0.01% or more, it shall be prima facie evidence that the person was driving with alcohol in his blood, subsection (f);

d) 0.05% or less it shall be presumed that the person was not intoxicated and was not driving while under the influence of alcohol, subsection (b);

e) more than 0.05% but less than 0.08%, this fact may not give rise to any presumption that the person was or was not intoxicated or was or was not driving while under the influence of alcohol, but this fact may be considered with other competent evidence in determining the guilt or innocence of the person, subsection (c).

The declarations as to prima facie evidence and the presumptions set out in CJ § 10–307(b) through (f) apply only to criminal prosecutions. *State v. Loscomb*, 291 Md. 424, 431, 435 A.2d 764 (1981). The trier of fact in a civil case may not apply the statutory presumptions. *Fouche v. Masters*, 47 Md.App. 11, 21, 420 A.2d 1279 (1980), but may consider expert testimony concerning the effects produced by various levels of alcohol in the blood.

■ Thus it is that Maryland recognizes degrees of the effects of the consumption of alcohol by a drinking driver, and ties them to the percentage of volume by weight of alcohol in the blood. The amount of alcohol in the blood of a drinking driver is admissible in a civil action as well as in a criminal cause as evidence of the degree of the impairment of the driver's normal coordination, faculties, and abilities as a result of the consumption of alcohol. The legislature obviously deems that the impairment increases as the percentage of alcohol in the blood increases. In civil actions, however, unlike in criminal causes, the percentage of alcohol in the blood does not serve as prima facie evidence of the degree of impairment, nor does it give rise in any presumptions with regard to it. In other words, in civil actions the burden of persuasion remains on the plaintiff to show by a preponderance of the evidence the degree of the defendant's impairment. We emphasize that in both civil actions and criminal causes, competent evidence other than the result of chemical analysis of the person's blood may be adduced to show the person's degree of impairment. CJ § 10–308. *See Major v. State,* 31 Md.App. 590, 595, 358 A.2d 609 (1976). We believe that in Maryland the concept of "intoxicated" is the same in the civil and the criminal context and that the concept of "under the influence of alcohol" is the same in the civil and the criminal context.[5]

## IV

### (a)

Lockett had been drinking at a bar in Towson between approximately 6:45 p.m. and 8:15 p.m. the day of the acci-

---

**5.** Maryland Code (1957, 1987 Repl. Vol.) Art. 27 § 388A, creating the crime of homicide by motor vehicle while intoxicated, provides:

In this section "intoxicated" has the same meaning as indicated in and is subject to the same presumptions and evidentiary rules of § 10–307 of the Courts Article regarding intoxication under the vehicle laws of this State.

*Id.,* subsection (a). The legislature has not defined either "intoxication" or "under the influence of alcohol."

dent. At the hospital to which she was removed after the accident, a specimen of her blood was taken as was normally done in the treatment of persons with certain injuries. The specimen was not obtained pursuant to CJ § 10–302 with a view toward prosecution for drunken driving. Therefore, although the analysis of her blood was positive for the presence of ethyl alcohol, the toxicology report did not state the amount in terms of percentage by weight but by milligrams per deciliter. There were 96 milligrams per deciliter in Lockett's blood at the time the specimen was taken and the court found that this was the equivalent of 0.08 percent by weight. The opinion of an expert witness, made with a reasonable degree of scientific probability, in answer to a hypothetical question, was that at the time of the accident the amount of alcohol in Lockett's blood was "approximately in the range of .11 to .12 percent [by weight]." [6] No evidence was adduced from anyone in contact with Lockett after the accident—police officers, paramedics, doctors, nurses, the Nasts or others who may have observed her—with regard to her appearance, conduct, actions or other indicia of drunkenness.

■ The evidence as to the alcohol content of Lockett's blood was legally sufficient to sustain a finding by the jury that she was "under the influence of alcohol" in the contemplation of the law of Maryland. It was not sufficient for a finding that she was "intoxicated."

(b)

At the time of the accident Houck and his brother were also coming from a bar in Towson. Houck denied that he was the driver of the car that struck the Lockett and Nast cars, and it was not until the following day that he admitted that he was in fact the driver. Houck refused to submit to a breathalyzer test and declined to let a blood specimen be

---

6. The exact time the blood specimen was taken was not shown on the hospital report nor did the expert witness know when and what Lockett had last eaten, a fact which could affect alcohol absorption.

taken at the hospital as was normally done as an aid in the treatment of his injuries. He denied that he had been drinking before the accident and claimed that he had not had a drink since the previous day. Although there was no chemical analysis of his breath or blood, there was ample credible evidence tending to belie these assertions, and tending to show that he had been consuming alcohol. Testimony by the investigating police officer who saw Houck at the scene and later at the hospital, a paramedic who attempted to treat him at the scene and transported him to the hospital, the medical doctor who treated him at the hospital, and the nurse who cared for him in the emergency room indicated that Houck was intoxicated.

The investigating police officer observed Houck standing beside his car at the scene of the accident. "I noticed a slight sway and stagger ... and speaking with him, I noticed an odor of alcoholic beverage on his breath." His clothing was "disarranged." He was "mush mouthed." His speech was "slightly slurred." The officer saw Houck again in the hospital emergency room.

> At that point he was excited. He was fighting with hospital personnel, cocky, excited, combative. His speech was still slurred and mush mouthed. While standing around in the hospital a couple of times, he stood up, he swayed, wobbled, and he needed the support gurney and an odor of alcoholic beverage was noticed on his breath again.

A paramedic testified that he observed Houck in the driver's seat of the car at the scene of the accident. Another paramedic had placed a cervical collar on Houck. Houck was trying to remove the collar and was "uncooperative." He appeared to be intoxicated—he smelled of alcohol, had bloodshot eyes, all he could do was moan, "he could not converse." Houck refused to let the paramedics treat him. He repeatedly removed the collar. He was so "combative" the paramedics could not place him on a "long back board" to support him in order to remove him to the ambulance.

The medical doctor who treated Houck at the hospital said that Houck was combative and uncooperative. He refused to have his lacerations sewed or be otherwise treated. The physician was of the opinion from his observations that Houck "was intoxicated and recovering from being intoxicated," that is slowly approaching sobriety, inasmuch as he was becoming more alert and able to communicate more clearly as time went by.

Evidence was adduced by way of a deposition of a registered nurse certified in emergency nursing. She had extensive experience in observing intoxicated persons.[7] She treated Houck at the hospital emergency room the night of the accident. She had noted on the emergency room chart "strong smell of alcohol, eyes bloodshot, speech slurred." He was just uncooperative. "[H]e simply refused to let us take care of him." She observed:

> Very few patients [with a laceration on the head] refuse to have care when they know that you are doing it in their best interest. Very few patients from the scene of an ambulance will refuse to have their head immobilized, very few refuse to have their blood drawn or have x-rays...."

He was "hostile" and "belligerent." His hygiene was not good and he was unkempt. According to the emergency room personnel there was no indication whatsoever that Houck's behavior was caused by trauma—head injury or brain damage. There was no "neurological deficit as in a

---

**7.** The nurse was asked how many people she had treated as an emergency room nurse. She replied that she had "worked full time in all of these years." She said:

> I probably assessed, I guess, an average over the years, maybe 50 patients a shift, and that is five shifts a week, 52 weeks a year for 11 years.

She was asked how many of those people were under the influence of alcohol. She said: "[A] good 20% of my patients have appeared to be under the influence of alcohol." She explained that she had "almost always worked the night shift, the graveyard shift...." She pointed out: "Unfortunately at night, there is a higher percentage of people that are intoxicated."

brain injury." In short, it is apparent that the considered opinion of all who had contact with Houck in the course of their duties after the accident was that he had consumed alcohol to the extent that his normal coordination, faculties, and physical and mental abilities were substantially and materially impaired—more than merely reduced or weakened. Those who observed Houck were of the impression that he was intoxicated.

We believe that the extensive evidence as to Houck's demeanor, comportment, behavior, mien, actions, conduct, and appearance, and the odor of alcohol surrounding him, was legally sufficient to sustain a finding by the jury that he was "intoxicated" in the contemplation of the law of Maryland.

## V

The trial judge considered the evidence pertaining to the drinking of Lockett and Houck and found that it was sufficient to submit the case to the jury on the question of "proximate cause of this accident among other things," as to "the compensatory damage aspects." But he had "a serious problem sending it on punitive damages." He decided as a matter of law that the conduct of Lockett and Houck, even considering their drinking, did not amount to such a wanton or reckless disregard for human life as would permit him to submit the matter of punitive damages to the jury. The judge, therefore, granted the defendants' motions to dismiss the counts seeking punitive damages. The judge was right as to Lockett and wrong as to Houck.

In submitting the case to the jury, the judge instructed it with respect to negligence and proximate cause. To assist the jury in its "determination as to whether or not both defendants or either of them were negligent," the judge informed it that it "may consider" certain traffic laws. The judge referred to:

1) TR § 21–301(c)(1)(i) proscribing a vehicle from crossing the centerline of a roadway divided into four or more

marked lanes for vehicular traffic and that provides for two-way movement of traffic.

2) TR § 21–604(b) prohibiting a person from turning a vehicle from a direct course or move it right or left on a roadway unless the movement can be made with reasonable safety.

3) TR § 21–402(b) declaring that if the driver of a vehicle intends to turn to go in the opposite direction, the driver shall yield the right-of-way to any approaching vehicle that is so near as to be an immediate danger.

4) TR § 21–1102(a) prescribing that the driver of a vehicle may not back it unless the movement can be made safely and without interfering with other traffic.

It is apparent that the traffic laws to which the judge referred applied to Lockett's operation of her automobile. But the judge cautioned:

Now, you are further instructed in this regard that if you should find that one of these rules of the road has been shown to have been violated that does not establish negligence in and of itself, but it may be considered by you as evidence of negligence along with all of the other evidence in the case.

The judge then turned to the evidence as to drinking by the defendants.

In addition, ladies and gentlemen, evidence of the consumption of alcohol to the extent that the faculties, coordination, and reactions of the persons in question are impaired may likewise be considered by you as evidence of negligence.

It is your function to decide from the facts presented to you whether or not either defendant had consumed alcohol prior to the accident and, if so, in what amount and whether or not the person's driving ability was impaired as a result of that consumption.

This instruction related to both Houck and Lockett. The judge further instructed:

Now, when the driver of a motor vehicle is faced with a sudden and real emergency which was not created by his or her own conduct, he must exercise reasonable care for his own safety and for the safety of others. The reasonableness of his actions must be measured by the standards of the acts of other drivers of ordinary skill and judgment faced with the same situation. He is not to be held to the same coolness or accuracy of judgment which is required of a person who has an ample opportunity to fully exercise his judgment.

This instruction apparently related to Houck. There was no exception to these instructions.

As is obvious from the jury's verdicts and awards of damages, it found that each of Lockett and Houck were negligent and that the negligence was a proximate cause of the accidents.

As to Houck, we believe, as we have stated, that the evidence, by a preponderance thereof, was sufficient for the jury, exercising its function of weighing the evidence and determining the credibility of the witnesses, to find as a fact that he was driving while intoxicated. It was also legally sufficient for the jury to find that in the operation of his automobile, he created a sudden and real emergency by his own conduct, or, if not, that, in any event, he did not respond to the emergency he faced with the required care.

As to Lockett, we believe, as we have stated, that the evidence, by a preponderance thereof, was sufficient for the jury, exercising its function of weighing the evidence and determining the credibility of the witnesses, to find as a fact that she was driving while under the influence of alcohol. It was also legally sufficient for the jury to find that she otherwise violated the law in the operation of her automobile by illegally crossing the centerline of the road, turning to the left, making a U-turn, and backing her automobile.

We have now arrived at the crux of this appeal. If the jury, considering all the circumstances, reached those factu-

al findings as to Houck and Lockett, would such findings be enough, as a matter of law, for it to conclude that Houck and Lockett, respectively, had a wanton or reckless disregard for human life in the operation of their automobiles? As we have seen, given the negligence of Houck and Lockett and the award of compensatory damages, the conclusion of the jury that they had a wanton or reckless disregard for human life would supply the legal malice necessary to elevate their negligence to gross negligence, and thereby support an award of punitive damages.

 We think that in civil automobile accident cases involving a drinking driver whether the driver had a wanton or reckless disregard for human life, in the operation of an automobile, is to be tested by a sliding scale. As the degree of impairment by the voluntary consumption of alcohol increases, the need for other aggravating circumstances lessens, and vice versa. In other words, a high degree of impairment calls for other aggravating circumstances, if any at all, of a less serious nature. The less the degree of impairment, the more the other conduct of the drinking driver needs to be extraordinary and outrageous. The requisite state of mind may be inferred [8] from at least two separate sets of circumstances. First, one may infer the driver's state of mind from the manner of operation of the motor vehicle. Outrageously dangerous driving permits an inference that the driver does not care whether he kills or severely injures someone else. Second, one may infer a reckless or wanton disregard for human life from the combined acts of voluntarily drinking until intoxicated and

---

**8.** A trial judge instructing a jury must take care not to confuse inferences with presumptions. Presumptions arise upon a showing of a certain set of facts, and depending upon their nature may or may not be overcome by contrary evidence. Inferences are always permissive and never required. A juror who finds that it is reasonable and rational to infer one fact from one or more other facts may do so, and may use the facts so found together with all other relevant facts, direct and inferred, in reaching a decision. A juror who does not find the possible inference to comport with his or her common sense and experiences in life is free to reject it.

then operating such a potentially dangerous instrumentality as an automobile. We have a caution, however, with our concept that negligent driving short of that which is so outrageously dangerous as to permit the requisite inference may be combined with evidence of drinking that does not amount to intoxication to produce a situation justifying the imposition of punitive damages. The two sets of circumstances are not always considered in a vacuum, wholly distinct one from the other. For example, when considering the conduct of the driver in the operation of a motor vehicle, the jury may find that consideration of the extent to which the driver had been drinking gives additional insight into the driver's probable state of mind. In that case, it is appropriate to add the fact of drinking to the mix of facts being considered. But we emphasize that what must not be forgotten is that the discretion to award punitive damages becomes available only when the combination of relevant facts demonstrates by a preponderance of the evidence that the driver had a wanton or reckless disregard for human life.[9] Although the requisite state of mind may be demonstrated by outrageously dangerous driving or driving after drinking to the point of being intoxicated, this does not mean that adding fifty percent of one to fifty percent of the other will also produce the requisite one hundred percent proof. The jury should be made aware that this would be improper. As we have seen, a driver who is guilty of one or more acts of negligence in the operation of his motor vehicle, but not to the point of outrageous or reckless conduct, and who had been drinking to the point of having his ordinary faculties somewhat impaired, but not to the point of being intoxicated, is not subject to punitive damages when, in fact, the evidence considered as a whole does not permit a rational inference that the driver had a reckless indifference for human life. In many cases, it is the

---

9. Of course, there also must be evidence of negligence that is a proximate cause of the accident.

drinking that produces the negligent driving. The cause may not simply be added to the effect.

In *Blackwell v. State*, 34 Md.App. 547, 369 A.2d 153, *cert. denied*, 280 Md. 728 (1977), the Court of Special Appeals reviewed the Maryland cases dealing with manslaughter by automobile. *Id.* at 560–566, 369 A.2d 153. As it read the opinions, "the only reason the appellate courts of Maryland have not permitted extreme intoxication to have raised simple negligence to gross negligence by express holding, is that no case has ever been before the Court where the evidence showed a state of inebriation that would sustain a verdict of driving while intoxicated." *Id.* at 561, 369 A.2d 153. The court believed, however, that the Court of Appeals foresaw, but did not foreclose that possibility, in *Thomas v. State*, 206 Md. 49, 56–58, 109 A.2d 909 (1954). In *Blackwell* there was legally sufficient evidence for the trier of fact to find that Blackwell was intoxicated. The court observed:

> *But it was not his condition alone that evidenced his wanton and reckless disregard for his fellow humans. That he coupled such insobriety with driving an automobile on a public highway made his conduct culpable.* It is common knowledge that an automobile is a dangerous instrumentality, and we notice that fact judicially. Motor vehicles cause more deaths in time of peace than do any other manmade device. *When appellant voluntarily, if not intentionally, drank himself into a state wherein his nervous system was numbed, adversely affecting his reflexes, coordination, discretion and judgment, to drive an automobile thereafter itself constituted a wanton or reckless disregard for human life.*

34 Md.App. at 565, 369 A.2d 153 (emphasis added). The court pointed out that "[t]o drive while simply under the influence [of alcohol]" is a direct violation of the law. *Id.* And it rationalized that when one is intoxicated—"the most extreme condition of insobriety recognized by law" (*id.* at 566, 369 A.2d 153)—one who drives thus incapacitated

may be inferred to have disregarded human life both wantonly *and* recklessly. When death ensues, inferentially or directly attributable to a breach of a duty by [the driver], derived from his self-induced condition of intoxication, driving while [intoxicated] may be sufficient to raise the cause of death from simple negligence to gross negligence, as a factual determination to be made by the fact finder.

*Id.* at 566, 369 A.2d 153 (emphasis in original).

In *Lloyd v. State,* 42 Md.App. 167, 399 A.2d 932, *cert. denied,* 285 Md. 732 (1979), a manslaughter by automobile case, the Court of Special Appeals read *Blackwell*

as holding that "extreme" intoxication by itself may indicate a "wanton or reckless disregard" and therefore justify a finding of gross negligence. Under *Blackwell,* however, it is clear that such a finding is not automatic simply because there is evidence of intoxication. Rather, the issue must be determined by the fact-finder on a case by case basis. This holding cannot be said, as appellant contends, to equate intoxication with gross negligence.

42 Md.App. at 170, 399 A.2d 932.

In *Willis v. State,* 55 Md.App. 65, 460 A.2d 1043 (1983), the Court of Special Appeals, quoting *Blackwell,* held in an automobile manslaughter case that Willis' "degree of sobriety [driving while intoxicated], as found by the jury, was sufficient [for the jury] to elevate simple negligence to gross negligence." *Id.* at 70, 460 A.2d 1043.[10]

■ We are not at odds with the opinions of the Court of Special Appeals in *Blackwell, Lloyd,* and *Willis.* Of course a finding by the jury that Houck did not exercise the

---

**10.** In *Willis v. State,* 55 Md.App. 65, 460 A.2d 1043 (1983), there was also legally sufficient evidence for the jury to find that the driver ran a red light. That circumstance was not considered in the court's conclusion that there was gross negligence. *Id.* at 70, 460 A.2d 1043.

The Court of Appeals affirmed the judgment on other grounds and did not reach the gross negligence issue. *Willis v. State,* 302 Md. 363, 488 A.2d 171 (1985).

requisite care when confronted with the emergency would not be enough in itself to show that he was grossly negligent. But, in the circumstances here, a finding by the jury that he was driving while intoxicated, would be sufficient for the jury to conclude that he had a wanton or reckless disregard for human life. Since the jury could so conclude, it follows that the circuit court was wrong in striking the counts seeking punitive damages from Houck, thereby keeping that issue from the consideration of the jury as a matter of law.

■ We have seen that the evidence as to Lockett was legally sufficient to establish that she was driving while under the influence of alcohol, but was not legally sufficient to show that she was intoxicated. The degree of her impairment, not having reached the level of intoxication, would not, without more, be sufficient to elevate her simple negligence to gross negligence.[11] Nor would the evidence as to her traffic law violations be legally sufficient in itself to show that she had a wanton or reckless disregard for human life. We have scanned the cases of this Court and of the Court of Special Appeals concerning automobile manslaughter.[12] We are satisfied from those cases that

---

**11.** The recognition by the legislature that a person's coordination, faculties, and mental and physical abilities are more substantially and materially impaired when he is "intoxicated" than when he is "under the influence of alcohol" is readily apparent even apart from the sanctions it has authorized. *See* note 5, *supra.* It has created a new substantive crime of homicide by motor vehicle while "intoxicated." Maryland Code (1957, 1987 Repl.Vol.) Art. 27, § 388A. It has not created a new crime of homicide by motor vehicle while "under the influence of alcohol."

**12.** *See* the summarization of Maryland automobile manslaughter cases by Powers, J., in his dissenting opinion in *Boyd v. State,* 22 Md.App. 539, 554–563, 323 A.2d 684, *cert. denied,* 272 Md. 738 (1974). *See also State v. Babb,* 258 Md. 547, 267 A.2d 190 (1970); *State v. Gibson,* 254 Md. 399, 254 A.2d 691 (1969); *Mauldin v. State,* 239 Md. 592, 212 A.2d 502 (1965); *Stokes v. State,* 220 Md. 471, 154 A.2d 714 (1959); *Faulcon v. State,* 211 Md. 249, 126 A.2d 858 (1956); *Wilson v. State,* 74 Md.App. 204, 536 A.2d 1192 (1988); *Baublitz v. Henz,* 73 Md.App. 538, 535 A.2d 497 (1988); *Savoy v. State,* 67 Md.App. 590, 508 A.2d 1002, *cert. denied,* 307 Md. 261, 513 A.2d 315 (1986); *Hasselhoff*

other conduct on Lockett's part of a more extraordinary and outrageous nature than the traffic laws which she may be found to have violated would have to be coupled with the fact that she was driving while under the influence of alcohol in order to elevate her negligence to gross negligence. It follows that, as a matter of law, the evidence with respect to Lockett was not sufficient to show that she entertained a wanton or reckless disregard for human life in the operation of her automobile leading to the accidents. Therefore, the circuit court did not err in striking the counts seeking punitive damages from her and in keeping that issue from the consideration of the jury as to her.

## VI

The "Verdict Sheet" returned by the jury read:

1) Do you find in favor of the Plaintiffs Edward Nast and Sandye Nast against the Defendant Lois Ann Lockett?

2) Do you find in favor of the Plaintiffs Edward Nast and Sandye Nast against the Defendant Charles Carroll Houck?

The answer to both questions was "Yes." The Verdict Sheet continued:

3) If your answer to either question number 1 or question number 2 is yes, what amount of damages do you award the Plaintiff Edward Nast?

4) If your answer to either question number 1 or question number 2 is yes, what amount of damages do you award the Plaintiff Sandye Nast?

The answer to each question was $1,300. Judgments were entered in favor of Edward Nast for $1,300 and in favor of

---

v. *State*, 67 Md.App. 645, 508 A.2d 1030 (1986); *Morrow v. State*, 47 Md.App. 296, 423 A.2d 251 (1980), *affirmed on other grounds*, 293 Md. 247, 443 A.2d 108 (1982); *Tipton v. State*, 39 Md.App. 578, 387 A.2d 628, *cert. denied*, 283 Md. 739 (1978); *Cummings v. State*, 27 Md.App. 361, 341 A.2d 294, *cert. denied*, 276 Md. 740 (1975); *Boyd v. State*, 22 Md.App. 539, 323 A.2d 684, *cert. denied*, 272 Md. 738 (1974).

Sandye Nast for $1,300 and in favor of them for costs.[13]

We affirm the judgment against Lockett. We affirm in part and reverse in part the judgment against Houck. The effect of the court's error with respect to Houck is that the Nasts are entitled to have the matter of punitive damages as to Houck considered by a trier of facts. Therefore, we vacate the order of the trial court dismissing the counts seeking punitive damages against Houck. We remand the case to the Circuit Court for Baltimore City for further proceedings limited to the issue of the allowance of punitive damages against Houck. We note that Houck does not suggest that the matter of compensatory damages be retried if there is a remand. He speaks in terms of "[i]f this case is remanded for the trial on the issue of punitive damages . . . ." He seems to be content that the award for compensatory damages stand rather than take the chance that on retrial the amount will be increased. He is apparently unwilling to accept the challenge that what he apparently deems to be a bird in hand will be lost in the legal thicket. In any event, the matter of liability and compensatory damages has been decided.

## VII

### (1)

As we have seen, Houck refused the request of the officer at the scene to take a breathalyzer test. At the hospital, he would not permit a blood specimen to be taken which was a normal hospital intake procedure for trauma patients. An analysis of the blood specimen would include the amount of alcohol in his blood. Before trial, Houck filed a motion in limine to exclude evidence as to his

---

13. Subsequent to the Nasts' notation of an appeal to the Court of Special Appeals and before our order certifying the case to us, the attorneys for the Nasts and the attorneys for Lockett filed an "Order of Satisfaction" stating that the case was "'AGREED, SETTLED AND SATISFIED,' as to Compensatory Damages only." Houck was not a party to the order.

refusals with respect to the breathalyzer test and the blood specimen. The court granted the motion. Several times during the trial the Nasts proffered evidence of Houck's refusals and each time the court refused to admit it. The Nasts claim that the refusal to admit the evidence was erroneous.[14] In light of our holding with respect to punitive damages, we agree. A known amount of alcohol in a person's blood, although not giving rise to prima facie evidence or any presumption in a civil case, has strong probative value as to the degree of impairment of that person. The degree of impairment is relevant and material with respect to primary negligence and to punitive damages. Therefore, the refusal to permit a chemical analysis tends to show a person's state of mind. It does not give rise to a presumption but it enables a reasonable inference that the person was aware that he was not sober and thought that his coordination, faculties, and mental and physical abilities were impaired to some extent, at least. It tends to show that he was reluctant to have evidence pertaining to the actual extent of his impairment ascertained. In other words, his refusal suggests at least an unwillingness to face an issue of intoxication. *See Clay v. State,* 211 Md. 577, 585, 128 A.2d 634 (1957).

We believe that, in the circumstances here, the evidence that Houck refused to submit to a chemical analysis of the amount of alcohol in his blood was admissible.[15]

---

**14.** As we have seen, *supra,* at the time the requests were made of Houck to submit to chemical analysis, the fact of refusal was inadmissible in a criminal prosecution. At the time the motion in limine was presented to the court, the legislature had changed its mind and declared the refusal admissible in a prosecution for drunken driving. *See* Md.Code (1974, 1984 Repl.Vol., 1987 Cum.Supp.) § 10–309(a) of the Courts and Judicial Proceedings Article.

**15.** Section 10–309(a) of the Courts and Judicial Proceedings Article of the Code provides: "No inference or presumption concerning either guilt or innocence arises because of refusal to submit [to a chemical analysis]." On its face, and when read with the entire subsection, this prohibition applies only to criminal prosecutions for drunken driving under the Transportation Article.

(2)

 Houck presented a motion in limine to exclude his driving record showing prior convictions for driving while intoxicated and while under the influence of alcohol. The court granted the motion. The Nasts claim that the court was wrong. We think that the court was right.

The Nasts' position is that the record of convictions was relevant to the jury's consideration of the punishment element of punitive damages and what amount thereof to impose. They equate it to the punishment stage of a criminal trial in which the sentencing judge may, after a verdict of guilty, consider prior offenses in assessing punishment. We do not find this reasoning to be persuasive. We think that the admission of this evidence could only unduly prejudice the jury in its deliberations even if the evidence was confined to the assessment of punitive damages. We agree with the trial judge that the evidence was inadmissible.

## VIII

The discretion to award punitive damages is an awesome power to be granted in negligence cases only where egregious or outrageous circumstances require it. In many automobile accident cases there will be evidence of negligence and evidence of drinking, but the facts will be a country mile away from the outrageous circumstances needed to justify consideration of punitive damages. The bench and bar should understand that the step we take today—recognizing that one who drinks to the point of becoming intoxicated and then undertakes the operation of a motor vehicle may be found to have had a wanton disregard for human life—is not an invitation to claim punitive damages in any case where negligence and drinking can be shown. The pleading requirement set forth in *Smith v. Gray Concrete Pipe Co.*, 267 Md. 149, 168, 297 A.2d 721 (1972), is fully applicable, and bald or conclusory allegations of "wanton or reckless disregard for human life," or language of similar import, will not be sufficient.

Because claims for punitive damages made for purely tactical or settlement advantage will likely cause delays in an already burdened system, create potential problems with respect to representation of defendants, and cause considerable apprehension on the part of those against whom the claim is made, the sanctions contemplated by Maryland Rule 1–341 should be imposed where such claims are made in bad faith or without substantial justification.

JUDGMENT AS TO LOIS ANN LOCKETT AFFIRMED;

JUDGMENT AS TO CHARLES CARROLL HOUCK AFFIRMED IN PART AND REVERSED IN PART;

CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS WITH RESPECT TO PUNITIVE DAMAGES AS TO CHARLES CARROLL HOUCK PURSUANT TO THIS OPINION.

COSTS TO BE PAID ONE–HALF BY APPELLANTS AND ONE–HALF BY APPELLEE CHARLES CARROLL HOUCK.