601 A.2d 102

**Sarah MURPHY et vir**

v.

**Richard Andre EDMONDS et al.**

No. 99, Sept. Term, 1990.

Court of Appeals of Maryland.

Feb. 7, 1992.

344

Philip O. Foard (George W. White, Jr., Jay D. Miller, White, Mindel, Clarke & Foard, all on brief) Towson, for petitioners/cross respondents.

Michael Maher, Orlando, Fla., amicus curiae for the Association of Trial Lawyers of America.

Paul D. Bekman, Scott R. Scherr, Baltimore, John J. Sellinger, Rockville, amicus curiae for the Maryland Trial Lawyers Ass'n.

Robert P. O'Brien (Marc K. Sloane, Niles, Barton & Wilmer, all on brief) Baltimore, for respondents/cross petitioners.

David M. Funk, Bryan D. Bolton, Stuart C. Axilbund, Shapiro and Olander, Baltimore, Stephen P. Carney, Gen. Counsel, amicus curiae for Medical Mutual Liability Ins. Soc. of Maryland.

H. Thomas Howell, Alan N. Gamse, Kathleen Howard Meredith, Scott D. Goetsch, Semmes, Bowen & Semmes, Baltimore, amicus curiae for The National Ass'n of Independent Insurers and The Maryland Ass'n of Defense Trial Counsel.

Michael T. Wharton, David A. Roling, Wharton, Levin & Ehrmantraut, Annapolis, amicus curiae for Product Liability Advisory Council, Inc. and The Motor Vehicle Mfrs.' Ass'n of the U.S. of America, Inc.

J. Joseph Curran, Jr., Atty. Gen., Kathryn M. Rowe, Asst. Atty. Gen., Robert A. Zarnoch, Asst. Atty. Gen., Annapolis, amicus curiae for State of Md.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE and CHASANOW, JJ., and ERNEST A. LOVELESS, Jr., Administrative Judge of the Seventh Judicial Circuit of Md., and H. CHESTER GOUDY, Jr., Judge of the Fifth Judicial Circuit of Md., Specially Assigned.

ELDRIDGE, Judge.

The principal question in this case is whether Maryland's $350,000 statutory cap on noneconomic damages in personal injury actions, Maryland Code (1974, 1989 Repl.Vol.), § 11–108 of the Courts and Judicial Proceedings Article, violates the Maryland Constitution.[1] We must also decide whether

---

1. Section 11–108 provides as follows:
 "§ 11–108. Personal injury action—Limitation on noneconomic damages.
 "(a) *Noneconomic damages.*—In this section:
 (1) 'Noneconomic damages' means pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury; and
 (2) 'Noneconomic damages' does not include punitive damages.

the issue of punitive damages was properly submitted to the jury.

## I.

This action arose from an accident occurring on December 14, 1987, on Interstate 83 in Baltimore County, Maryland. At the time of the accident, the plaintiff Sarah Murphy was driving her automobile southbound on I–83, and the defendant Richard Andre Edmonds was proceeding northbound. Edmonds, an employee of the defendant Port East Transfer, Inc., was operating a tractor-trailer owned by Port East. Unexpectedly, the left front tire of the tractor-trailer blew out, and the truck swerved to the left, crossing the median and the southbound lanes of I–83. In the process, the truck collided with Mrs. Murphy's car. Mrs. Murphy sustained substantial physical injuries in the collision.

Mrs. Murphy and her husband filed a complaint and request for a jury trial in the Circuit Court for Baltimore County on May 12, 1988, naming Richard Andre Edmonds and Port East Transfer, Inc., as defendants. In count I of the complaint, the plaintiff sought compensatory and punitive damages for personal injuries to Sarah Murphy. Count II requested compensatory and punitive damages on behalf of Mr. and Mrs. Murphy for loss of consortium. The complaint, as later amended, asserted that the defendant Edmonds was acting within the scope of his employment at

---

"(b) *Limitation of $350,000 established.*—In any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000.

"(c) *Award under § 3–2A–06 included.*—An award by the health claims arbitration panel in accordance with § 3–2A–06 of this article shall be considered an award for purposes of this section.

"(d) *Jury trials.*—(1) In a jury trial, the jury may not be informed of the limitation established under subsection (b) of this section.

(2) If the jury awards an amount for noneconomic damages that exceeds the limitation established under subsection (b) of this section, the court shall reduce the amount to conform to the limitation."

the time of the collision, that the conduct of both defendants was "negligent, unsafe, reckless and outrageous," and that the defendants acted "with a conscious indifference to the consequences." Specifically, the plaintiffs alleged that Edmonds was exceeding the speed limit at the direction of Port East, that the defendants knew that the truck's left front tire was in an unsafe condition, and that both defendants "knew or should have known that their actions in driving a large vehicle with an unsafe tire at an excessive rate of speed would create an unreasonable risk of danger to other motorists on the highway...." [2]

At the trial, the plaintiffs presented evidence that Edmonds was late for work on the day of the accident, that he was supposed to drive the tractor-trailer to Harrisburg, Pennsylvania, and that he was in a hurry to get there. Edmonds testified that he had inspected the tires on the truck before departing for Harrisburg and had not observed anything wrong. Furthermore, Edmonds stated that the service department at Port East had informed him that the tire was new. There was also testimony indicating that, after the blow out, Edmonds dove to the floor of the cab instead of attempting to control the tractor-trailer.

The evidence at the trial further disclosed that, following the collision, Port East sent the tire to the manufacturer, Michelin, in order to determine the cause of the blow out. The results of the report by Michelin's product analysis engineer, Mr. Emanuel Zambelas, were introduced in evidence by the plaintiffs. In Mr. Zambelas's opinion, the blow

---

2. On July 10, 1989, Edmonds and Port East filed a third party complaint against the Michelin Tire Corporation, the manufacturer of the tire that blew out. The third party complaint asserted that the theory of the plaintiffs' case was that the tire blew out because it had been improperly patched. Port East stated that if the tire "blew out because of the patch it was because the tire required a special patching procedure or could not safely be patched," and Michelin had failed to warn Port East of this. Therefore, Port East and Edmonds claimed "contribution and/or indemnification" from Michelin. The defendants dismissed the third party complaint before a responsive pleading was filed by Michelin.

out was caused by an improper repair of the tire which caused "the tire to fatigue and fail" at the point of repair. Port East and Edmonds denied patching the tire and asserted that they were not aware of the improper patch. Mr. Zambelas also stated that proper inspection of the tire would have revealed a visible hole in the outside tread, indicating that the tire should be replaced.

At the conclusion of the trial, the jury returned verdicts for the plaintiffs in the following amounts:

1. for past medical expenses, $24,665.31;
2. for future medical expenses, $17,500;
3. for noneconomic damages, $510,000;
4. for past loss of household services, $20,000;
5. for future loss of household services, $225,000;
6. for other loss of consortium claims, $0;
7. for punitive damages as to Mr. Edmonds, $3,000;
8. for punitive damages as to Port East Transfer, Inc., $1,000,000.

Entry of final judgment was delayed until post-trial motions were heard. The defendants filed three post-trial motions. The first sought to have the compensatory award for noneconomic damages and the loss of consortium awards, including the awards for loss of household services, aggregated and reduced to $350,000 pursuant to the cap provided for in § 11–108 of the Courts and Judicial Proceedings Article. The second motion was for judgment notwithstanding the verdict. The third motion sought a remittitur, or in the alternative, a new trial. The plaintiffs, in response, argued *inter alia* that § 11–108 of the Courts and Judicial Proceedings Article violated several provisions of the Maryland Declaration of Rights.

After a hearing, the circuit court denied the motions for judgment n.o.v. and for a remittitur. The court also denied the motion to aggregate the loss of consortium awards with the noneconomic damages, concluding that loss of household services constituted economic damage.

Moreover, the circuit court held that § 11–108 violated the equal protection guarantee embodied in Article 24 of the Maryland Declaration of Rights. The trial judge initially stated that the statute creates a classification between (1) tort plaintiffs who are less severely injured and thus entitled to keep everything which the jury awards, and (2) tort plaintiffs who are catastrophically injured and who are not entitled to receive noneconomic damages over $350,000. The trial judge then determined that, because the right to press a claim for pain and suffering was recognized at common law before the Maryland Constitution was adopted, the right to press a claim for pain and suffering was an "important right." The judge reasoned that the cap infringes upon this important right because an individual may have damages for pain and suffering in excess of the $350,000 limitation. In light of his view that the classification created by § 11–108 infringes upon an "important right," the trial judge concluded that equal protection principles required that the classification be subject to a "heightened scrutiny" test. Applying a "heightened scrutiny" test, the trial judge held that § 11–108 violated the equal protection guarantee embodied in Article 24 of the Maryland Declaration of Rights. He refused to apply the cap to the noneconomic portion of the plaintiffs' compensatory award, and final judgment was entered in accordance with the jury's verdicts.

Edmonds and Port East took an appeal to the Court of Special Appeals, contending that the cap on noneconomic damages provided for in § 11–108 of the Courts and Judicial Proceedings Article was constitutional. Edmonds and Port East also raised several nonconstitutional issues relating to liability, compensatory damages, and punitive damages. The plaintiffs, in addition to arguing that § 11–108 violated equal protection principles, reiterated several other constitutional challenges to the statute which had been made in the circuit court. Specifically, it was claimed that § 11–108 violated the right to a jury trial under Articles 5 and 23 of

the Maryland Declaration of Rights,[3] was inconsistent with the separation of powers requirement in Article 8 of the Declaration of Rights,[4] and infringed upon Article 19 of the Declaration of Rights.[5]

The Court of Special Appeals rejected all of the challenges to the validity of § 11–108 and held that the statute was constitutional. *Edmonds v. Murphy*, 83 Md.App. 133, 573 A.2d 853 (1990). In considering the trial court's holding that the statute violated equal protection principles, the Court of Special Appeals disagreed with the trial judge's

---

3. Article 5 of the Declaration of Rights provides as follows:
"That the Inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, according to the course of that Law, and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six; and which, by experience, have been found applicable to their local and other circumstances, and have been introduced, used and practiced by the Courts of Law or Equity; and also of all Acts of Assembly in force on the first day of June, eighteen hundred and sixty-seven; except such as may have since expired, or may be inconsistent with the provisions of this Constitution; subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State. And the Inhabitants of Maryland are also entitled to all property derived to them from, or under the Charter granted by His Majesty Charles the First to Caecilius Calvert, Baron of Baltimore."
Article 23 of the Declaration of Rights states in pertinent part as follows:
\* \* \* \* \* \*
"The right of trial by Jury of all issues of fact in civil proceedings in the several Courts of Law in this State, where the amount in controversy exceeds the sum of five hundred dollars, shall be inviolably preserved."

4. Article 8 of the Declaration of Rights provides:
"That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

5. Article 19 states:
"That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land."

conclusion that the classification created by § 11–108 was subject to "heightened scrutiny." Instead, according to the intermediate appellate court, the classification was subject to the traditional "rational basis test" and, under that test, was clearly not in violation of equal protection principles. Alternatively, the Court of Special Appeals held that even if § 11–108 were subject to "heightened scrutiny," it would not infringe upon the equal protection guarantee. In addition, the intermediate appellate court held that § 11–108 constituted "reasonable" economic regulation and, therefore, did not violate Article 19 of the Declaration of Rights. The appellate court further held that the statute violated neither the jury trial nor the separation of powers provisions of the Declaration of Rights, relying upon the reasons set forth in *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 376 S.E.2d 525 (1989); and *Franklin v. Mazda Motor Corp.*, 704 F.Supp. 1325 (D.Md.1989).

In light of its holding that the cap provided for by § 11–108 was constitutional, the Court of Special Appeals reduced the award for noneconomic damages from $510,000 to $350,000. The Court of Special Appeals, however, rejected the defendants' argument that the awards for past and future loss of household services also constituted noneconomic damages subject to the cap; instead, the appellate court held that these awards were not subject to the cap. The Court of Special Appeals reversed the awards for punitive damages, holding that the evidence was insufficient for the jury to have concluded that either defendant was guilty of gross negligence. Otherwise, the intermediate appellate court upheld the circuit court's judgment.

The plaintiffs filed in this Court a petition for a writ of certiorari, arguing that § 11–108 violated the Maryland Declaration of Rights and that the Court of Special Appeals erred in reversing the awards for punitive damages. The defendants filed a cross-petition for a writ of certiorari, contending that the Court of Special Appeals erred in holding that the awards for loss of household services were not subject to the cap. This Court granted both the petition

and the cross-petition, *Murphy v. Edmonds*, 321 Md. 46, 580 A.2d 1066 (1990).

Subsequent to the issuance of the writ of certiorari but before oral argument, this Court in *United States v. Searle*, 322 Md. 1, 7, 584 A.2d 1263, 1266 (1991), held that "where an award for household services is compensation for the loss of domestic services and is based on the market value of those lost services," the award is not subject to the § 11–108 cap on noneconomic damages. Recognizing that *Searle* was dispositive with respect to the awards for loss of household services in this case, the defendants at oral argument before us did not ask for a reversal of the Court of Special Appeals' decision concerning the awards for loss of household services.

In this Court, the plaintiffs attack the constitutionality of § 11–108 on only two grounds. First, they contend that the classification created by § 11–108 violates the equal protection guarantee of Article 24 of the Maryland Declaration of Rights. Second, they argue that § 11–108 infringes upon the right to a jury trial under Articles 5 and 23 of the Declaration of Rights.

## II.

### A.

██ Although the Maryland Constitution contains no express equal protection clause, it is settled that the Due Process Clause of the Maryland Constitution, contained in Article 24 of the Declaration of Rights, embodies the concept of equal protection of the laws to the same extent as the Equal Protection Clause of the Fourteenth Amendment.[6] *See, e.g., Hargrove v. Board of Trustees*, 310 Md.

---

**6.** Article 24 of the Declaration of Rights provides as follows:
"**Article 24. Due process.**
"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

406, 416, 529 A.2d 1372, 1377 (1987), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 753, 98 L.Ed.2d 766 (1988); *Ennis v. State,* 306 Md. 579, 591, 510 A.2d 573, 579 (1986); *State v. Wyand,* 304 Md. 721, 726, 501 A.2d 43, 46 (1985), *cert. denied,* 475 U.S. 1095, 106 S.Ct. 1492, 89 L.Ed.2d 893 (1986); *Hornbeck v. Somerset Co. Bd. of Educ.,* 295 Md. 597, 640, 458 A.2d 758, 780–781 (1983); *Attorney General v. Waldron,* 289 Md. 683, 704–705, 426 A.2d 929, 940–941 (1981); *Board of Supervisors of Elections v. Goodsell,* 284 Md. 279, 293 n. 7, 396 A.2d 1033, 1040 n. 7 (1979); *Governor v. Exxon Corp.,* 279 Md. 410, 438 n. 8, 370 A.2d 1102, 1118 n. 8 (1977), *aff'd,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *Mortgage Co. v. Matthews,* 167 Md. 383, 394–395, 173 A. 903, 909, *rev'd on other grounds,* 293 U.S. 232, 55 S.Ct. 168, 79 L.Ed. 299 (1934). *Cf. Lyng v. Castillo,* 477 U.S. 635, 636 n. 2, 106 S.Ct. 2727, 2728 n. 2, 91 L.Ed.2d 527, 532 n. 2 (1986), and cases there cited; *Bowen v. Owens,* 476 U.S. 340, 106 S.Ct. 1881, 90 L.Ed.2d 316 (1986) (Due Process Clause of the Fifth Amendment contains an equal protection component).

While the Equal Protection Clause of the Fourteenth Amendment and the equal protection guarantee embodied in Article 24 of the Maryland Declaration of Rights are obviously independent and capable of divergent application, we have consistently taken the position that the Maryland equal protection principle applies " 'in like manner and to the same extent as' " the Equal Protection Clause of the Fourteenth Amendment. *Attorney General v. Waldron, supra,* 289 Md. at 704–705, 426 A.2d at 941. Thus, United States Supreme Court opinions concerning the Equal Protection Clause of the Fourteenth Amendment " 'are practically direct authorities' " with regard to Article 24 of the Declaration of Rights. *Waldron,* 289 Md. at 705, 426 A.2d at 941, quoting *Bureau of Mines v. George's Creek,* 272 Md. 143, 156, 321 A.2d 748, 755 (1974). *See Hargrove v. Board of Trustees, supra,* 310 Md. at 416, 529 A.2d at 1377; *Ennis v. State, supra,* 306 Md. at 591, 510 A.2d at 580; *State v. Wyand, supra,* 304 Md. at 726, 501 A.2d at 46; *Hornbeck v. Somerset Co. Bd. of Educ., supra,* 295 Md. at

640, 458 A.2d at 781 ("We have, however, long recognized that decisions of the Supreme Court interpreting the Equal Protection Clause of the federal constitution are persuasive authority in cases involving the equal treatment provisions of Article 24").

Consequently, even though the plaintiffs have based their equal protection challenge to § 11–108 solely on the Maryland Constitution, we shall consider their argument in light of cases applying the Equal Protection Clause of the Fourteenth Amendment as well as cases applying Article 24 of the Maryland Declaration of Rights.

### B.

The plaintiffs, like the circuit court, view § 11–108 of the Courts and Judicial Proceedings Article as creating a classification between less seriously injured tort plaintiffs who are entitled to keep everything which the jury awards and more seriously injured tort plaintiffs who are not entitled to receive noneconomic damages exceeding $350,000. The plaintiffs' equal protection challenge to the statute is based upon the theory, adopted by the circuit court, that this classification should be subject to a "heightened" degree of scrutiny.

In light of the plaintiffs' argument, it may be desirable to consider the different standards which have evolved for reviewing classifications challenged under the equal protection guarantees. In most instances when a governmental classification is attacked on equal protection grounds, the classification is reviewed under the so-called "rational basis" test. Generally under that test, a court " 'will not overturn' " the classification " 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [governmental] actions were irrational.' " *Gregory v. Ashcroft*, —— U.S. ——, ——, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410, 430 (1991), quoting *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939,

943, 59 L.Ed.2d 171, 176 (1979). *See Pennell v. San Jose,* 485 U.S. 1, 14, 108 S.Ct. 849, 859, 99 L.Ed.2d 1, 16 (1988). A statutory classification reviewed under the rational basis standard enjoys a strong presumption of constitutionality and will be invalidated only if the classification is clearly arbitrary. *See, e.g., Briscoe v. P.G. Health Dep't,* 323 Md. 439, 448–449, 593 A.2d 1109, 1113–1114 (1991); *Hargrove v. Board of Trustees, supra,* 310 Md. at 423, 529 A.2d at 1380; *State v. Wyand, supra,* 304 Md. at 726–727, 501 A.2d at 46; *Whiting–Turner Contract. Co. v. Coupard,* 304 Md. 340, 352, 499 A.2d 178, 185 (1985); *Department of Transportation v. Armacost,* 299 Md. 392, 409, 474 A.2d 191, 199 (1984); *State v. Good Samaritan Hospital,* 299 Md. 310, 328, 473 A.2d 892, 901, *appeal dismissed,* 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 7 (1984); *Montgomery Co. v. Fields Road,* 282 Md. 575, 579–580, 386 A.2d 344, 347 (1978).

Where, however, a statutory classification burdens a "suspect class" or impinges upon a "fundamental right," the classification is subject to strict scrutiny. Such statutes will be upheld under the equal protection guarantees only if it is shown that " 'they are suitably tailored to serve a compelling state interest.' " *Broadwater v. State,* 306 Md. 597, 603, 510 A.2d 583, 585 (1986), quoting *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985). *See, e.g., Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534, 541–542 (1971) ("classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny"); *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600, 615 (1969) ("in moving from State to State ... appellees were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional"); *Kramer v. Union Free School District,* 395 U.S. 621, 627, 89 S.Ct. 1886, 1889–1890, 23 L.Ed.2d 583, 589 (1969) (classification impinging upon the right to vote). *See also O.C. Taxpayers*

*v. Ocean City,* 280 Md. 585, 594, 375 A.2d 541, 547 (1977) ("we are ... here dealing with the right to vote, and thus the classification is subject to ... special scrutiny").

■ Finally, there are classifications which have been subjected to a higher degree of scrutiny than the traditional and deferential rational basis test, but which have not been deemed to involve suspect classes or fundamental rights and thus have not been subjected to the strict scrutiny test. Included among these have been classifications based on gender (*Mississippi University For Women v. Hogan,* 458 U.S. 718, 723, 102 S.Ct. 3331, 3335, 73 L.Ed.2d 1090, 1097 (1982); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971)),[7] discrimination against illegitimate children under some circumstances (*Weber v. Aetna Casualty & Surety Company,* 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); *Levy v. Louisiana,* 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968)), a classification between children of legal residents and children of illegal aliens with regard to a free public education (*Plyler v. Doe,* 457 U.S. 202, 217–218, 224, 102 S.Ct. 2382, 2395, 2398, 72 L.Ed.2d 786, 799–800, 803 (1982)), and a classification under which certain persons were denied the right to practice for compensation the profession for which they were qualified and licensed (*Attorney General v. Waldron, supra,* 289 Md. at 716–728, 426 A.2d at 947–954).

There has in recent years been much discussion in judicial opinions and academic writings concerning these statutory classifications which, for purposes of equal protection analysis, have been subjected to greater scrutiny than the deferential rational basis test but have not been subjected to strict scrutiny. The discussion has focussed on terminol-

---

**7.** In Maryland, because of the Equal Rights Amendment to the Maryland Constitution (Article 46 of the Maryland Declaration of Rights), classifications based on gender are suspect and subject to strict scrutiny. *State v. Burning Tree Club, Inc.,* 315 Md. 254, 295, 554 A.2d 366, 386, *cert. denied,* 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989).

ogy, the nature of the classifications and the test, and what must be shown for a particular statutory classification to be upheld.

In several cases over a considerable period of time, the Supreme Court's opinions seemed to treat these statutory classifications as falling within a single intermediate category, and it was said that the classifications were subject to "scrutiny" or "heightened scrutiny" or "intermediate scrutiny." *See, e.g., Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 905, 909, 106 S.Ct. 2317, 2322, 2324, 90 L.Ed.2d 899, 907, 910 (1986) (plurality opinion, taking position that state statute giving armed forces veterans civil service employment preference if they were state residents when they entered military service was subject to "heightened scrutiny" and was invalid under the Equal Protection Clause); *Cleburne v. Cleburne Living Center, supra*, 473 U.S. at 440–442, 105 S.Ct. at 3254–3255, 87 L.Ed.2d at 320–321 (while it applied the rational basis test to the statute before it, the Court pointed out that certain legislative classifications are subject to "heightened" review; the Court also used the phrase "quasi-suspect classification"); *Mississippi University For Women v. Hogan, supra*, 458 U.S. at 723, 102 S.Ct. at 3335, 73 L.Ed.2d at 1097 (discrimination based on gender "subject to scrutiny under the Equal Protection Clause"); *Plyler v. Doe, supra*, 457 U.S. at 218 n. 16, 102 S.Ct. at 2395 n. 16, 72 L.Ed.2d at 800 n. 16 (refers to the "technique of 'intermediate' scrutiny"). *See also* the discussion in *Attorney General v. Waldron, supra*, 289 Md. at 707–714, 426 A.2d at 942–946. The Supreme Court has stated that, in order for a legislative classification reviewed under "heightened scrutiny" or "intermediate scrutiny" to be sustained, the classification "must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren, supra*, 429 U.S. at 197, 97 S.Ct. at 457, 50 L.Ed.2d at 407. *See Plyler v. Doe, supra*, 457 U.S. at 230, 102 S.Ct. at 2402, 72 L.Ed.2d at 808 (classification "must be justified by a showing that it furthers some substantial state interest").

The above-described three-tiered equal protection analysis (*i.e.*, rational basis, intermediate scrutiny, and strict scrutiny) has been criticized. Justice Marshall, for example, has forcefully argued in favor of "rejecting a rigidified approach to equal protection analysis, and of employing an approach that allows for varying levels of scrutiny depending upon 'the constitutional and societal importance of the interest adversely affected and the recognized invidiousness of the basis upon which the particular classification is drawn.' " *Plyler v. Doe, supra*, 457 U.S. at 231, 102 S.Ct. at 2402, 72 L.Ed.2d at 808 (Marshall, J., concurring), quoting from *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 99, 93 S.Ct. 1278, 1330, 36 L.Ed.2d 16, 81 (1973) (Marshall, J., dissenting). *See Cleburne v. Cleburne Living Center, supra*, 473 U.S. at 460, 105 S.Ct. at 3265, 87 L.Ed.2d at 333 (Marshall, J., concurring in part and dissenting in part). Whether the Supreme Court will apply an "intermediate" scrutiny test to any new statutory classifications may be questionable. Some of the Court's recent opinions seem to suggest that equal protection analysis should be two-tiered, and that, unless a statutory classification is subject to strict scrutiny because it burdens a suspect class or impinges upon a fundamental right, it should be reviewed under the traditional rational basis test. *See, e.g., Pennell v. San Jose, supra*, 485 U.S. at 14, 108 S.Ct. at 859, 99 L.Ed.2d at 16; *Exxon Corp. v. Eagerton*, 462 U.S. 176, 195–196, 103 S.Ct. 2296, 2308, 76 L.Ed.2d 497, 513–514 (1983).

Several recent Supreme Court opinions have utilized the rational basis test to invalidate legislative classifications, and, in the view of some, the Court in these cases applied a less deferential standard of review than had previously been applied under the traditional rational basis test. *See, e.g., Cleburne v. Cleburne Living Center, supra*, 473 U.S. at 446–450, 105 S.Ct. at 3258–3260, 87 L.Ed.2d at 324–327; *Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985); *Williams v. Vermont*, 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985); *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 105 S.Ct. 1676, 84

L.Ed.2d 751 (1985); *Zobel v. Williams,* 457 U.S. 55, 102
S.Ct. 2309, 72 L.Ed.2d 672 (1982). Some commentators
have characterized the Court's review in these and similar
cases as "rational basis with teeth" or "rational basis with
bite." *See* D. Stewart, *A Growing Equal Protection
Clause?* 71 A.B.A. Journal (October) 108, 112 (1985), quot-
ing Victor Rosenblum of Northwestern University Law
School; G. Pettinga, *Rational Basis With Bite: Interme-
diate Scrutiny by Any Other Name,* 62 Ind.L.J. 779 (1987).
*See also* G. Gunther, *In Search of Evolving Doctrine On a
Changing Court: A Model For a Newer Equal Protection,*
86 Harv.L.Rev. 1, 18–19 (1972) ("these cases found bite in
the equal protection clause after explicitly voicing the tradi-
tionally toothless minimal scrutiny standard").[8]

As previously indicated, the plaintiffs' equal protection
challenge to § 11–108 of the Courts and Judicial Proceed-

---

**8.** The same author has elsewhere expressed the following view (G.
Gunther, *Constitutional Law,* 605 n. 5 (11th ed. 1985)):
 "The 'newer equal protection' is *not* the same as the 'intermediate'
 scrutiny developed in the modern cases for some quasi-suspect
 classifications such as gender. The 'newer equal protection' theory
 does not take issue with the heightened scrutiny tiers of 'strict' and
 'intermediate' review. Instead, it is solely addressed to the appro-
 priate intensity of review to be exercised when the lowest tier, that
 of rationality review, is deemed appropriate. It is in the 'mere
 rationality' cases that the Warren Court virtually abandoned effec-
 tive scrutiny of any sort. What the 'newer equal protection model'
 asks is that some teeth be put into that lowest level of scrutiny, that
 it be applied 'with bite,' focusing on means without second-guessing
 legislative ends. (Evaluating the importance of the ends is charac-
 teristic of all higher levels of scrutiny.) In short, 'newer equal
 protection' seeks to raise slightly the lowest tier of review under the
 two- or three-tier models; but it does *not* seek to raise the 'mere
 rationality' level appropriate for run-of-the-mill economic regulation
 cases all the way up to the level of 'intermediate' or of 'strict'
 scrutiny."
*Compare* L. Tribe, *American Constitutional Law,* § 16–3, at 1445–1446
(2d ed. 1988), where the author comments on the *Zobel, Hooper* and
*Cleburne* opinions as follows:
 "While there may be grounds for the reluctance to proliferate new
 categories of classifications overtly triggering closer scrutiny, its
 *covert* use under the minimum rationality label presents dangers of
 its own. The lack of openly acknowledged criteria for heightened

ings Article rests entirely upon the theory that the "intermediate scrutiny" standard should continue to be applied when "important personal rights" are involved, that the classification created by § 11–108 does infringe upon an important personal right, and that, therefore, the classification is subject to heightened scrutiny under the intermediate standard. Among the numerous cases dealing with equal protection challenges to legislative "caps" upon the recovery of tort damages, the plaintiffs rely upon those applying heightened scrutiny. *See Carson v. Maurer,* 120 N.H. 925, 932, 941–943, 424 A.2d 825, 830, 836–838 (1980) ("the rights involved herein are sufficiently important to require that the restrictions imposed on those rights be subjected to a more rigorous judicial scrutiny than allowed under the rational basis test"); *Arneson v. Olson,* 270 N.W.2d 125, 133 (N.D.1978). *See also Brannigan v. Usitalo,* 134 N.H. 50, 587 A.2d 1232, 1234–1235 (1991); *Richardson v. Carnegie Library Restaurant, Inc.,* 107 N.M. 688, 763 P.2d 1153, 1161–1164 (1988); *Condemarin v. University Hosp.,* 775 P.2d 348, 354–360 (Utah 1989).

■ We reject the plaintiffs' contention that the classification created by § 11–108 of the Courts and Judicial Pro-

---

scrutiny permits arbitrary use of the type of inquiry undertaken in *Cleburne,* for which courts will remain essentially unaccountable. With no articulated principle guiding the use of this more searching inquiry, even routine economic regulations may from time to time succumb to a form of review reminiscent of the *Lochner* era. A far better approach would subject to heightened review only those classifications determined to be quasi-suspect after explicit judicial debate over the reasons for so regarding them—reasons amply present in the instance of zoning out the mentally retarded but not necessarily in all of the other instances recently subjected to covertly heightened scrutiny. The resulting protection would not be left to the manipulable discretion of judges operating with multiple standards of review all masquerading as 'minimum rationality.' For all the remaining forms of economic regulation, the minimum rationality test would continue to govern under the traditional, deferential 'conceivable basis' test—as, for the most part it still does—as a means of upholding all but the most brazenly and blatantly irrational governmental measures."

ceedings Article is subject to any level of scrutiny higher than the traditional, deferential rational basis test. Moreover, we disagree with the holdings in the above-cited cases applying heightened scrutiny to legislative caps upon recoverable damages. Whatever may be the appropriate mode of equal protection analysis for some other statutory classifications, in our view a legislative cap of $350,000 upon the amount of noneconomic damages which can be awarded to a tort plaintiff does not implicate such an important "right" as to trigger any enhanced scrutiny. Instead, the statute represents the type of economic regulation which has regularly been reviewed under the traditional rational basis test by this Court and by the Supreme Court.

██ In arguing that the right to recover tort damages in excess of $350,000 for noneconomic injury is an "important personal right" requiring enhanced scrutiny, the plaintiffs rely upon the fact that under common law principles a tort plaintiff could recover his full damages for noneconomic injury. Under Article 5 of the Maryland Declaration of Rights, however, the common law is subject "to the revision of, and amendment or repeal by, the Legislature of this State." The common law may also be changed by this Court. *Julian v. Christopher*, 320 Md. 1, 9, 575 A.2d 735, 739 (1990); *McCrory Corp. v. Fowler*, 319 Md. 12, 20, 570 A.2d 834, 838 (1990); *Wildermuth v. State*, 310 Md. 496, 529, 530 A.2d 275, 291–292 (1987); *Ireland v. State*, 310 Md. 328, 331–332, 529 A.2d 365, 366–367 (1987); *Kelley v. R.G. Industries, Inc.*, 304 Md. 124, 140, 497 A.2d 1143, 1150–1151 (1985), and cases there cited. In addition, "there is no vested interest in any rule of the common law." *Attorney General v. Johnson*, 282 Md. 274, 299, 385 A.2d 57, 71, *appeal dismissed*, 439 U.S. 805, 99 S.Ct. 60, 58 L.Ed.2d 97 (1978). *See Hill v. Fitzgerald*, 304 Md. 689, 703, 501 A.2d 27, 34 (1985); *Whiting–Turner Contract. Co. v. Coupard*, *supra*, 304 Md. at 360, 499 A.2d at 189. Simply because a legal principle is part of the common law, instead of being statutory, does not give it any greater degree of insulation from legislative change.

Many, if not most, common law principles could be viewed as conferring a "right" in the same sense in which the plaintiffs are using that term. Any one of these "rights" could, under some circumstances, be important to the person affected. Furthermore, in Maryland where our basic law is common law except as changed legislatively or by this Court, most statutes which deal with a particular subject for the first time have the effect of modifying common law principles. A statute which changes the common law in a manner favorable to one party in litigation will have changed it to the detriment of his opponent. Under the plaintiffs' view that a statutory restriction upon a common law "right" is sufficient to trigger enhanced scrutiny for purposes of equal protection analysis, there would be countless legislative classifications subject to heightened scrutiny. If the plaintiffs' position is correct, heightened scrutiny instead of rational basis might well become the standard equal protection test.

Moreover, the great majority of cases which have considered equal protection attacks upon classifications created by legislative caps upon recoverable tort damages have utilized a traditional rational basis test. The Supreme Court in *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), overruled due process and equal protection challenges to a legislative cap upon tort damages recoverable by those injured in nuclear accidents against the operators of private nuclear power plants. In rejecting the argument that "[a]n intermediate standard [of review] like that applied in cases such as *Craig v. Boren*," *supra*, was appropriate, the Court described the cap legislation "as a classic example of an economic regulation—a legislative effort to structure and accommodate 'the burdens and benefits of economic life.'" *Duke Power Co. v. Carolina Env. Study Group*, *supra*, 438 U.S. at 83, 98 S.Ct. at 2635–2636, 57 L.Ed.2d at 617–618. With regard to the contention that the legislation abrogated a common law right of recovery without providing a reasonable substitute remedy, the Supreme Court initially noted

that "[o]ur cases have clearly established that '[a] person has no property, no vested interest, in any rule of the common law.' " *Duke Power*, 438 U.S. at 88 n. 32, 98 S.Ct. at 2638 n. 32, 57 L.Ed.2d at 620 n. 32, quoting *Second Employers' Liability Cases*, 223 U.S. 1, 50, 32 S.Ct. 169, 175, 56 L.Ed. 327, 346 (1912), quoting *Munn v. Illinois*, 94 U.S. 113, 134, 24 L.Ed. 77, 87 (1877). The *Duke Power* opinion concluded (438 U.S. at 93–94, 98 S.Ct. at 2641, 57 L.Ed.2d at 624):

"The general rationality of the Price–Anderson Act liability limitations—particularly with reference to the important congressional purpose of encouraging private participation in the exploitation of nuclear energy—is ample justification for the difference in treatment between those injured in nuclear accidents and those whose injuries are derived from other causes. Speculation regarding other arrangements that might be used to spread the risk of liability in ways different from the Price–Anderson Act is, of course, not pertinent to the equal protection analysis."

Other cases applying a traditional rational basis analysis when reviewing classifications created by legislative caps on recoverable tort damages, and holding that the legislation did not violate equal protection principles, include, *e.g.*, *Davis v. Omitowoju*, 883 F.2d 1155, 1158 (3d Cir.1989); *Boyd v. Bulala*, 877 F.2d 1191, 1196–1197 (4th Cir.1989); *Hoffman v. United States*, 767 F.2d 1431, 1435–1436 (9th Cir.1985); *Fein v. Permanente Medical Group*, 38 Cal.3d 137, 162–164, 211 Cal.Rptr. 368, 385–387, 695 P.2d 665, 682–684, *appeal dismissed*, 474 U.S. 892, 106 S.Ct. 214, 88 L.Ed.2d 215 (1985); *Johnson v. St. Vincent's Hospital*, 273 Ind. 374, 397–400, 404 N.E.2d 585, 600–601 (1980); *LaMark v. NME Hospitals, Inc.*, 542 So.2d 753, 755–756 (La.App.), *cert. denied*, 551 So.2d 1334 (La.1989); *English v. New England Medical Center, Inc.*, 405 Mass. 423, 427–430, 541 N.E.2d 329, 332–333 (1989), *cert. denied*, 493 U.S. 1056, 110 S.Ct. 866, 107 L.Ed.2d 949 (1990); *Meech v. Hillhaven West, Inc.*, 238 Mont. 21, 43–45, 776 P.2d 488, 501–502 (1989); *Prendergast v. Nelson*, 199 Neb. 97, 114–115, 256 N.W.2d

657, 668–669 (1977); *Wright v. Colleton County School Dist.*, 301 S.C. 282, 291–292, 391 S.E.2d 564, 570 (1990); *Etheridge v. Medical Center Hospitals, supra,* 237 Va. at 103–104, 376 S.E.2d at 533–534.

## C.

■ Although the plaintiffs did not in their briefs in this Court argue that § 11–108 of the Courts and Judicial Proceedings Article violated Article 19 of the Maryland Declaration of Rights, at oral argument the suggestion was made that the classification created by § 11–108 implicated Article 19 and that, for this reason, the classification was subject to heightened scrutiny for purposes of equal protection analysis under Article 24 of the Declaration of Rights. In our view, the classification does not sufficiently affect a tort plaintiff's Article 19 rights so as to require enhanced scrutiny under Article 24.

Article 19 provides in pertinent part that every person "for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right . . . fully without any denial, . . . according to the Law of the land." The phrase "Law of the land" in Article 19 is the same phrase used in Article 24 and means due process of law. *Hill v. Fitzgerald, supra,* 304 Md. at 702, 501 A.2d at 33; *Whiting–Turner Contract. Co. v. Coupard, supra,* 304 Md. at 360, 499 A.2d at 189; *Attorney General v. Johnson, supra,* 282 Md. at 298–299, 385 A.2d at 71.

■ As the *Hill, Whiting–Turner,* and *Johnson* cases also point out, Article 19 does guarantee access to the courts, but that access is subject to reasonable regulation. A statutory restriction upon access to the courts violates Article 19 only if the restriction is unreasonable. *Hill,* 304 Md. at 703, 501 A.2d at 34; *Whiting–Turner,* 304 Md. at 360, 499 A.2d at 189; *Johnson,* 282 Md. at 298–299, 385 A.2d at 71.

We have indicated, with regard to causes of action to recover for violations of certain fundamental rights, that an abrogation of access to the courts which would leave the plaintiff totally remediless would be unreasonable. *See Hill,* 304 Md. at 702–703, 501 A.2d at 33–34, quoting *Allen v. Dovell,* 193 Md. 359, 363–364, 66 A.2d 795, 797 (1949) (in which the Court, in the context of a suit to recover property which the plaintiff claimed had been taken in violation of constitutional rights, stated "that the Legislature cannot cut off all remedy and deprive a party of his right of action"); *Weyler v. Gibson,* 110 Md. 636, 653–654, 73 A. 261, 263 (1909) (an action to recover for violations of the plaintiff's constitutional rights, and the Court indicated that if the State's immunity from suit were extended to an action against the responsible state officials, Article 19 would be violated). *Cf. Ritchie v. Donnelly,* 324 Md. 344, 374 n. 14, 597 A.2d 432, 446 n. 14 (1991). On the other hand, the abolition of some common law causes of action, without providing an alternate remedy, has not been deemed to violate Article 19. *See, e.g.,* Maryland Code (1984, 1991 Repl.Vol.), §§ 3–102 and 3–103 of the Family Law Article.

In our view, the limitation upon recoverable noneconomic tort damages under § 11–108 of the Courts and Judicial Proceedings Article does not amount to a restriction upon access to the courts. There is a distinction between restricting access to the courts and modifying the substantive law to be applied by the courts. The plaintiffs' cause of action based on negligence was not abolished by § 11–108. Instead, § 11–108 simply modifies the law of damages to be applied in tort cases. While the right to recover noneconomic damages exceeding $350,000 was abrogated, this change in the substantive law is not a restriction upon access to the courts.

Assuming, however, that § 11–108 were to be viewed as some degree of restriction upon access to the courts, it

would be an entirely reasonable restriction for the reasons set forth below in Part II D of this opinion.[9]

 If a statutory classification constitutes a reasonable restriction upon access to the courts under Article 19, the fact that the classification may implicate access to the courts does not require that heightened scrutiny be applied in equal protection analysis. *See Whiting–Turner Contract. Co. v. Coupard, supra,* 304 Md. at 350–352, 360, 499 A.2d at 184, 189 (classification created by a statute of repose is a reasonable restriction upon access to the courts under Article 19 and is not subject to heightened scrutiny for purposes of applying the equal protection guarantee embodied in Article 24).

### D.

 For the reasons set forth above, the plaintiffs' equal protection challenge to the classification created by § 11–108 of the Courts and Judicial Proceedings Article will be considered under the traditional rational basis test. Thus, as summarized in *Whiting–Turner Contract. Co. v. Coupard, supra,* 304 Md. at 352, 499 A.2d at 185, the statute

"can be invalidated only if the classification is without any reasonable basis and is purely arbitrary. Further, a classification having some reasonable basis need not be

---

**9.** The United States District Court for the District of Maryland, in *Franklin v. Mazda Motor Corp.,* 704 F.Supp. 1325, 1337 (D.Md.1989), also concluded that § 11–108 of the Courts and Judicial Proceedings Article was a reasonable restriction upon access to the courts.

Courts elsewhere have held that statutory caps upon recoverable tort damages do not violate state constitutional provisions similar to Article 19. *See, e.g., Jones v. State Board of Medicine,* 97 Idaho 859, 864, 555 P.2d 399, 404 (1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977); *Wright v. Colleton School,* 301 S.C. 282, 291, 391 S.E.2d 564, 570 (1990). Other courts, however, have held that statutory caps upon damages, where no alternate remedy or commensurate benefit was provided, are in violation of constitutional provisions like Article 19. *See, e.g., Smith v. Department of Ins.,* 507 So.2d 1080, 1087–1088 (Fla.1987); *Lucas v. United States,* 757 S.W.2d 687, 690–691 (Tex.1988).

made with mathematical nicety and may result in some inequality. If any state of facts reasonably can be conceived that would sustain the classification, the existence of that state of facts at the time the law was enacted must be assumed."

Moreover, " '[a] statutory classification tested by the rational basis standard enjoys a strong presumption of constitutionality, and a reasonable doubt as to its constitutionality is sufficient to sustain it.' " *Briscoe v. P.G. Health Dep't, supra,* 323 Md. at 448, 593 A.2d at 1113, quoting *State v. Good Samaritan Hospital, supra,* 299 Md. at 328, 473 A.2d at 901.

Section 11–108 was enacted in response to a legislatively perceived crisis concerning the availability and cost of liability insurance in this State. This crisis resulted in the unavailability of liability insurance for some individuals and entities, especially those engaged in hazardous activities such as asbestos removal, and increasing difficulty in obtaining reinsurance. *See Report of the Governor's Task Force to Study Liability Insurance,* 3–4 (Dec.1985). The crisis also affected the medical profession, resulting in excessive insurance premiums for doctors and declining services for patients, especially in high risk specialties such as obstetrics. *See Report of the Joint Executive/Legislative Task Force on Medical Malpractice Insurance,* 5 (Dec.1985).[10]

In considering whether to enact the cap on tort damages, the General Assembly had before it the above-cited task force reports, both of which advocated a $250,000 cap on noneconomic damage awards. *See Report of the Gover-*

---

**10.** One commentator has pointed out that the reasons behind enactment of the damage cap are: "(1) the desire to attract private insurers back to the Maryland market; (2) the need for qualified physicians providing a full complement of medical services in Maryland; and (3) the necessity of providing affordable liability insurance to health care providers." Comment, *Blasting the Cap: Constitutional Issues Arising From Maryland's Limitation of Noneconomic Damages in Personal Injury Claims,* 16 U.Balt.L.Rev. 327, 328 (1987).

*nor's Task Force to Study Liability Insurance, supra,* at 10–13; *Report of the Joint Executive/Legislative Task Force on Medical Malpractice Insurance, supra,* at 28–29. Neither task force believed that the cap should be extended to economic damages. *Ibid.* The *Report of the Governor's Task Force to Study Liability Insurance* stated that the cap would lead to greater predictability of damage awards, thus making the insurance market more stable and attractive to underwriters. The Report also noted that noneconomic damages are "impossible to ascertain with precision and are subject to emotional appeals to a jury," so that a $250,000 cap would permit a more realistic recovery in this area. *See Report of the Governor's Task Force to Study Liability Insurance, supra,* at 11.

In addition to these reports, the General Assembly also had before it numerous letters and petitions urging enactment of the cap from members of the medical profession seeking relief from high insurance premiums and from members of the public who feared that the insurance crisis would result in reduced availability of medical services. Furthermore, the General Assembly had reports urging adoption of the cap by interest groups such as The Business Roundtable and the Tort Policy Working Group. Before enacting the cap the Legislature considered existing and proposed tort reform and liability insurance legislation in all fifty states. *See* National League of Cities, *Tort Reform, Liability and Liability Insurance Legislation in 1986* (June 1986) (Department of Legislative Reference's file on Senate Bill 558 of the 1986 Session).

The General Assembly's objective in enacting the cap was to assure the availability of sufficient liability insurance, at a reasonable cost, in order to cover claims for personal injuries to members of the public. This is obviously a legitimate legislative objective. A cap on noneconomic damages may lead to greater ease in calculating premiums, thus making the market more attractive to insurers, and ultimately may lead to reduced premiums, making insurance more affordable for individuals and organizations perform-

ing needed services. The cap, therefore, is reasonably related to a legitimate legislative objective. *See, e.g., Davis v. Omitowoju, supra,* 883 F.2d at 1158 ("Clearly the ... decision to curb, through legislation, the high costs of malpractice insurance and thereby promote quality medical care ... provides a rational basis for capping the amount of damages that can be awarded a plaintiff"); *Hoffman v. United States, supra,* 767 F.2d at 1437 (the "Legislature had a 'plausible reason' to believe that the limitations on noneconomic recovery would limit the rise in ... insurance costs"); *Fein v. Permanente Medical Group, supra,* 38 Cal.3d at 162–164, 211 Cal.Rptr. at 386–387, 695 P.2d at 683–684; *Etheridge v. Medical Center Hospitals, supra,* 237 Va. at 92–94, 104, 376 S.E.2d at 527–528, 534. *Cf. Attorney General v. Johnson, supra,* 282 Md. at 306–313, 385 A.2d at 76–80.

Since, the General Assembly had before it several studies which concluded that $250,000 would cover most noneconomic damage claims, the Legislature did not act arbitrarily in enacting the cap at $350,000. It is also significant that the cap applies to all personal injury claimants equally rather than singling out one category of claimants.

Therefore, we hold that the legislative classification drawn by § 11–108 between tort claimants whose noneconomic damages are less that $350,000 and tort claimants whose noneconomic damages are greater than $350,000, and who are thus subject to the cap, is not irrational or arbitrary. It does not violate the equal protection component of Article 24 of the Declaration of Rights.

### III.

The plaintiffs' alternate constitutional challenge to § 11–108 is based upon the right to a jury trial guaranteed by Articles 5 and 23 of the Maryland Declaration of Rights. Specifically, the plaintiffs argue that the procedure required by § 11–108, which prohibits the jury from being informed of the $350,000 limitation on noneconomic damages, inter-

feres with the jury's ability properly to determine damages. In addition, the plaintiffs contend that the mandatory reduction to $350,000 of the jury's award for noneconomic damages "interferes with the jury's exclusive province in determining factual issues."

 The Maryland Declaration of Rights, in guaranteeing a right to a jury trial in civil cases where the requisite amount in controversy is present, "preserves 'unimpaired the ultimate historical right as it existed' " at common law. *Higgins v. Barnes*, 310 Md. 532, 542, 530 A.2d 724, 729 (1987), quoting *Knee v. City Pass. Ry. Co.*, 87 Md. 623, 627, 40 A. 890, 892 (1898). As the wording of Article 23 itself indicates, the jury trial right in civil cases relates to "issues of fact" in legal actions. It does not extend to issues of law, equitable issues, or matters which historically were resolved by the judge rather than by the jury. *See generally, e.g., In re Petition For Writ of Prohibition*, 312 Md. 280, 319, 539 A.2d 664, 683 (1988) ("fact finding is the primary and basic function of the jury"); *Higgins v. Barnes, supra*, 310 Md. at 542–548, 551–552, 530 A.2d at 729–732, 733–734; *Bringe v. Collins*, 274 Md. 338, 346, 335 A.2d 670, 676, *application for stay denied*, 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 475 (1975); *Md. Community Dev. Inc. v. S.R.C.*, 261 Md. 205, 211–214, 274 A.2d 641, 645–646, *appeal dismissed*, 404 U.S. 803, 92 S.Ct. 62, 30 L.Ed.2d 35 (1971); *Houston v. Lloyd's*, 241 Md. 10, 215 A.2d 192 (1965); *Turner v. Wash. Sanitary Comm.*, 221 Md. 494, 503, 158 A.2d 125, 130 (1960).

Moreover, the constitutional right to a jury trial is concerned with whether the court or the jury shall decide those issues which are to be resolved in a judicial proceeding. *See, e.g., In re Petition For Writ of Prohibition, supra*, 312 Md. at 308–326, 539 A.2d at 677–686 (trial judge's setting aside jury determination, as against the weight of the evidence, did not usurp jury's function); *Higgins v. Barnes, supra*, 310 Md. at 540–552, 530 A.2d at 728–734 (whether specified issues were for the court or the jury); *Turner v. Wash. Sanitary Comm., supra*, 221 Md. at 503,

158 A.2d at 130 ("To answer the contention that the court usurped the jury's function, resort must be had to the appropriate rules of the common law at the time our first constitution was adopted"); *Shellfish Commrs. v. Mansfield,* 125 Md. 630, 634, 94 A. 207, 208–209 (1915) (statute providing for court review of jury's resolution of disputed facts assumed to be invalid under the constitutional right to a jury trial). Where, however, the General Assembly has provided that a matter shall not be resolved in a judicial proceeding, by legislatively abrogating or modifying a cause of action, no question concerning the right to a jury trial arises. Since, under such circumstances, the matter will not be resolved in a judicial proceeding, the question as to whether a judge or a jury shall resolve the matter simply does not arise.

Thus, in *Branch v. Indemnity Ins. Co.,* 156 Md. 482, 487, 144 A. 696, 697 (1929), this Court pointed out that as long as the abolition of a common law cause of action was valid under other provisions of the Constitution (*e.g.,* Articles 19 and 24 of the Declaration of Rights), "there would be [an] ... inconsistency in holding, nevertheless, that a right of jury trial according to the course of the common law must in such cases be recognized...." The Court in *Branch,* 156 Md. at 488, 144 A. at 698, quoting with approval from *State v. Clausen,* 65 Wash. 156, 210–211, 117 P. 1101, 1119 (1911), went on as follows:

" 'If the power to do away with a cause of action in any case exists at all ..., then the right of trial by jury is thereafter no longer involved in such cases. The right of jury trial being incidental to the right of action, to destroy the one is to leave the other nothing upon which to operate.' "

Moreover, the Court in *Branch,* 156 Md. at 486, 144 A. at 697, indicated that where the Legislature authorizes a jury trial to determine the facts with regard to liability, but the statute itself fixes the damages, there is no interference with the constitutional right to a jury trial. *See also Jacobs v. Adams,* 66 Md.App. 779, 798, 505 A.2d 930, 940, *cert.*

*denied sub nom. Barnes v. Cauthen,* 306 Md. 513, 510 A.2d 259 (1986) ("If there is no cause of action, there is nothing to which the right of trial by jury can attach").

If the General Assembly had provided in § 11–108 of the Courts and Judicial Proceedings Article that the trial judge, rather than the jury, should determine the amount of noneconomic damages or the amount of noneconomic damages in excess of $350,000, a substantial issue concerning the validity of the statute would be presented. The General Assembly, however, did not attempt to transfer what is traditionally a jury function to the trial judge. Instead, the General Assembly abrogated any cause of action for noneconomic tort damages in excess of $350,000; it removed the issue from the judicial arena. No question exists concerning the role of the judge versus the jury with respect to noneconomic tort damages in excess of $350,000. Therefore, no question concerning the constitutional right to a jury trial is presented.

Section 11–108 fully preserves the right of having a jury resolve the factual issues with regard to the amount of noneconomic damages. Neither the $350,000 limit on recovery nor the provision that the jury shall not be informed of the limit, interferes with the jury's proper role and its ability to resolve the factual issues which are pertinent to the cause of action.

The majority of courts which have considered the issue agree that legislative caps upon recoverable tort damages do not violate the constitutional right to a jury trial. In rejecting the argument that § 11–108 infringes upon the right to a jury trial, the United States District Court for the District of Maryland stated (*Franklin v. Mazda Motor Corp., supra,* 704 F.Supp. at 1331):

"The power of the legislature to define, augment, or even abolish complete causes of action must necessarily include the power to define by statute what damages may be recovered by a litigant with a particular cause of action."

The Supreme Court of Virginia, in *Etheridge v. Medical Center Hospitals, supra,* 237 Va. at 96, 376 S.E.2d at 529, similarly rejected the argument that a legislative cap on recoverable tort damages violated the Virginia Constitution's guarantee of a jury trial, saying:

"[T]he Virginia Constitution guarantees only that a jury will resolve disputed facts....

"Without question, the jury's fact-finding function extends to the assessment of damages.... Once the jury has ascertained the facts and assessed the damages, however, the constitutional mandate is satisfied.... Thereafter, it is the duty of the court to apply the law to the facts....

"The limitation on medical malpractice recoveries contained in Code § 8.01–581.15 does nothing more than establish the outer limits of a remedy provided by the General Assembly. A remedy is a matter of law, not a matter of fact.... A trial court applies the remedy's limitation only *after* the jury has fulfilled its fact-finding function. Thus, Code § 8.01–581.15 does not infringe upon the right to a jury trial because the section does not apply until after a jury has completed its assigned function in the judicial process."

*See also, e.g., Davis v. Omitowoju, supra,* 883 F.2d at 1163 ("if a ... court can require a jury to restrict its verdict to conform to a legislative cap, as we are satisfied it can, then we are also satisfied that a ... court can correct or modify an unfettered verdict so as to comply with the same legislative mandate"); *Boyd v. Bulala, supra,* 877 F.2d at 1196 ("it is not the role of the jury to determine the legal consequences of its factual findings.... That is a matter for the legislature"); *Johnson v. St. Vincent's Hospital, supra,* 273 Ind. at 400–401, 404 N.E.2d at 601–602; *English v. New England Medical Center, Inc., supra,* 405 Mass. at 426–427, 541 N.E.2d at 331–332; *Wright v. Colleton County School Dist., supra,* 282 S.C. at 290–291, 391 S.E.2d at 569–570.

We conclude, therefore, that § 11–108 does not violate the right to a jury trial protected by Articles 5 and 23 of the Declaration of Rights.

## IV.

 The final issue concerns the jury's awards of punitive damages.

In the circuit court, in the Court of Special Appeals, and in this Court, all parties to this case have proceeded upon the assumption that if the evidence was sufficient for the jury to have found that the defendants were guilty of gross negligence, then the jury was entitled to award punitive damages. Neither the petition for a writ of certiorari nor the cross-petition questioned the applicability of the gross negligence standard. Moreover, our order granting the certiorari petitions did not add an issue relating to the appropriate standard for an award of punitive damages in a case such as this. *See* Maryland Rule 8–131(b). Consequently we shall assume, for purposes of this case only, that gross negligence is the proper standard for allowing an award of punitive damages in this case and that a showing of actual malice is not required. *See Boyer v. State,* 323 Md. 558, 581 n. 15, 594 A.2d 121, 132 n. 15 (1991). *Cf. Schaefer v. Miller,* 322 Md. 297, 312–332, 587 A.2d 491, 498–509 (1991) (opinion of Judges Eldridge, Cole, and Chasanow).

We agree with the Court of Special Appeals that the evidence presented by the plaintiffs was insufficient for the jury to have found gross negligence, which has been defined in motor vehicle tort cases as "a 'wanton or reckless disregard for human life' in the operation of a motor vehicle." *Smith v. Gray Concrete Pipe Co.,* 267 Md. 149, 167, 297 A.2d 721, 731 (1972). *See also Nast v. Lockett,* 312 Md. 343, 350, 539 A.2d 1113, 1117 (1988).

The plaintiffs argue that the evidence showed gross negligence on the part of the defendant Port East Transfer because Port East either (1) improperly repaired the front

tire of the tractor-trailer and allowed it to be used knowing that it was unsafe to do so, or (2) knew or should have known that another party had improperly patched the truck's front tire based on its routine inspections and allowed the truck to be driven knowing of its unsafe condition. The plaintiffs also argue that, although Port East had knowledge of the tire's unsafe condition, it urged its driver Edmonds to exceed the speed limit on the day of the accident. The plaintiffs contend that the defendant Edmonds was guilty of gross negligence because of evidence showing that (1) based on his inspection of the tires on the day of the accident he knew or should have known of the improper repair of the tire, and he chose to drive the truck anyway at an excessive rate of speed, and (2) after the tire blew out, he dove to the floor of the cab rather than trying to bring the truck under control, thus unreasonably endangering other motorists.

Although the evidence presented by the plaintiffs supports the conclusion that the defendants were negligent, it does not support the jury's finding of gross negligence. The plaintiffs presented evidence through the testimony of Emanuel Zambelas, a product analysis engineer for Michelin Tire Co., that the tire blew out because of an improper repair or patching of the tire. Furthermore, the witness testified that the improper repair would have been visible upon an external inspection of the tire, because there would have been a hole in the tread. Mr. Zambelas also stated, however, that the improper repair resulted in the rusting of the steel belts in the tire which eventually caused the blowout. This rusting was not visible upon external inspection of the tire. Moreover, except for the hole in the external surface of the tire, which was between the width of one to two pencils, the testimony was uncontradicted that the tread of the failed tire exceeded the minimum tread depth required by both federal and Maryland Department of Transportation standards and that the tire was in good condition. While the plaintiffs claimed that Port East had repaired the tire, they did not present any evidence in

support of this contention. Port East denied that either it or Edmonds had patched the tire, but neither defendant presented evidence as to who did patch the tire.

Considering the lack of evidence as to the party responsible for patching the tire, and the fact that a physical inspection would not have revealed the internal rust of the steel belts, the evidence regarding the tire was not sufficient to demonstrate a wanton or reckless disregard for life by either defendant. In light of the hole in the tread, it could be inferred that one or the other or both defendants did not inspect the tire carefully enough to observe the hole in the tire. It also could be inferred that, while one or both of the defendants observed the hole in the tire's surface during inspection, they concluded that it was not serious enough to require immediate attention since the tire was not losing air. Neither inference supports a finding of gross negligence.

The evidence as to whether the defendant Edmonds was speeding at the time of the accident was conflicting, but, taken in a light most favorable to the plaintiffs, the evidence would show that Edmonds was exceeding the speed limit by only four to five m.p.h. While this may have been negligent, it was not grossly negligent. Moreover, although evidence was presented that Edmonds was late for work and that he may have been in a hurry, there was no evidence supporting the plaintiffs' allegation that Port East directed Edmonds to exceed the speed limit.

Finally, the plaintiffs point to evidence that sometime after the blow out, Mr. Edmonds dove to the floor of the cab because he feared for his life. From this the plaintiffs infer that Edmonds failed to apply the truck's brakes. Nevertheless, the evidence was uncontradicted that there were skidmarks made by Edmond's truck as it crossed the six lanes of Interstate 83 and that these were caused by the application of the brakes. Thus, even if Edmonds did dive to the floor, it was apparently after he applied his brakes.

The various acts of negligence on the part of defendants do not, as a matter of law, permit the conclusion that either defendant acted with a wanton or reckless disregard for human life. The Court of Special Appeals correctly reversed the awards for punitive damages.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PLAINTIFFS TO PAY COSTS.

McAULIFFE, Judge, concurring.

I concur in the result. I do not agree with the majority that the interests affected by this legislation are not of sufficient importance "as to trigger *any* enhanced scrutiny." Majority opinion at 361 (emphasis added). In this case particularly, where we are called upon to conduct an equal protection analysis pursuant to the provisions of the Maryland Constitution, I would utilize the flexible "continuum" or "full-spectrum" approach [1] rather than a rigid two-tier or three-tier approach. *See Hargrove v. Board of Trustees*, 310 Md. 406, 427–30, 529 A.2d 1372 (1987) (McAuliffe, J., dissenting).

Employing that approach and subjecting the statute to a level of scrutiny consistent with the significance of the benefit curtailed, I nevertheless conclude that the General Assembly's judgment of societal need rests upon a sufficiently firm basis to justify the limitation of benefits involved and the inequality that will sometimes inevitably result.

CHASANOW, Judge, dissenting.

The majority contends that the right to full recovery for pain, suffering, disfigurement, and other noneconomic dam-

---

1. The more flexible approach "allows for varying levels of scrutiny depending upon 'the constitutional and societal importance of the interest adversely affected and the recognized invidiousness of the basis upon which the particular classification is drawn.'" *Plyler v. Doe,* 457 U.S. 202, 231, 102 S.Ct. 2382, 72 L.E.2d 786 (1982) (Marshall, J., concurring), quoting from *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 99, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Marshall, J., dissenting).

ages from the person whose tortious acts caused such injuries is not an "important personal right." I respectfully dissent. Under Maryland Code (1974, 1989 Repl.Vol.), Courts & Judicial Proceedings Article, § 11–108 (hereinafter "the cap"), noneconomic damages are defined to include "pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other non-pecuniary injury." It seems to me that the right to recover full and fair compensation from a tortfeasor is an important personal right, and any limitation on that right should be subject to "heightened" or "intermediate" scrutiny. Further, in my opinion, legislation limiting recovery of noneconomic damages might survive such heightened scrutiny if applied in medical malpractice cases, but it should not survive heightened scrutiny in motor vehicle tort actions or other tort actions where there has been no clearly established need for such legislation.

The legislature had three choices when dealing with noneconomic damages. It could have 1) eliminated them altogether; 2) proportionately reduced every plaintiff's noneconomic damages; or 3) reduced the damages of those people who suffer noneconomic damages over $350,000. It chose the third course and, thereby, deprived some, but not all, plaintiffs of the right to recover their full noneconomic damages from the tortfeasors who caused their injuries. The most severely injured will have their damages reduced, whereas less seriously injured plaintiffs will recover their entire noneconomic damages.

There is a sad, even tragic, aspect of the class of tort victims who will be most significantly affected by the cap. It is obvious that those whose noneconomic damages will be greatest and who will lose the most by the cap will be those whose injuries are the most severe as well as those who must endure their injuries for the longest period of time. Infants with paralyzed or severed arms or legs, young children hideously and permanently scarred or disfigured, youngsters with injuries that will cause them permanent excruciating and unremitting pain and who can be expected

to suffer from these injuries over the full seventy-plus years of their probable lifetimes will be the ones with the highest noneconomic damages and, therefore, the ones most affected by the cap. Disregarding the somewhat offsetting effects of inflation and investment income, $350,000 in noneconomic damages could amount to less than $5,000 per year for such tragically injured children, and these child victims will not even have the same loss of earnings damages that most adults would have.

The defendants do not contend that the cap was a legislative decision that $350,000 represented the maximum reasonable amount of damages that should be awarded for noneconomic injuries. To so construe the statute would mean that the legislature was saying that juries are incapable of rendering fair verdicts for noneconomic damages; if so, the cap may violate Article 23 of the Maryland Constitution, which guarantees civil litigants the right to a jury trial. If the cap is intended to be, in effect, a legislatively imposed remittitur, it may even violate the doctrine of separation of powers. *See Sofie v. Fibreboard Corp.*, 112 Wash.2d 636, 771 P.2d 711, 720–21 (1989). Defendants agree with the Court of Special Appeals determination that "[t]he 'object' of § 11–108(b) is the increase in availability and affordability of liability insurance in Maryland." *Edmonds v. Murphy,* 83 Md.App. 133, 162, 573 A.2d 853, 867 (1990).

In order to reduce insurance premiums and increase the availability of insurance, the legislature shifted the economic burden from liability insurance carriers and tortfeasors to the horribly injured and maimed victims whose noneconomic damages exceed $350,000. The legislature clearly has the power to change or modify the common law, but in doing so, it must be mindful of the constitutional rights of those affected by the changes. Since the cap statute impacts on some, but not all, tort victims, it raises an equal protection issue. How do we examine this legislation? Do we give it a passing glance under the rational basis test, look at it

under the magnifying glass of heightened scrutiny, or closely examine it under the microscope of strict scrutiny?

Professor Tribe noted that the emergence of the heightened, intermediate level of review was a judicial response to the growing awareness that the

"all-or-nothing choice between minimum rationality and strict scrutiny ill-suits the broad range of situations arising under the equal protection clause, many of which are best dealt with neither through the virtual rubber-stamp of truly minimal review nor through the virtual death-blow of truly strict scrutiny, but through methods more sensitive to risks of injustice than the former and yet less blind to the needs of governmental flexibility than the latter."

Laurence H. Tribe, *American Constitutional Law* § 16–32, at 1609–10 (2d ed. 1988). A number of scholarly articles have advocated a heightened scrutiny analysis of damage caps. *See, e.g.*, Mary Ann Willis, *Limitation on Recovery of Damages; Medical Malpractice Cases: A Violation of Equal Protection?*, 54 U.Cin.L.Rev. 1329–51 (Spr.1986); Gail Harper, *Which Equal Protection Standard for Medical Malpractice Legislation*, 8 Hastings Const. L.Q. 125–52 (Fall 1980).

I believe that Maryland should join the ranks of those states that have recognized that the right of people to be compensated fully for their injuries "certainly is amply important and substantial to justify the invocation of at least the heightened, intermediate test instead of the minimum rationality test." *Richardson v. Carnegie Library Restaurant, Inc.*, 107 N.M. 688, 763 P.2d 1153, 1163 (1988). *See also Sibley v. Bd. of Sup'rs of Louisiana State U.*, 477 So.2d 1094, 1107–09 (La.1985) (damage cap subject to heightened scrutiny review); *Brannigan v. Usitalo*, 587 A.2d 1232 (N.H.1991) (cap on noneconomic damages in all personal injury actions which "precluded only the most seriously injured victims ... from receiving full compensation for their injuries" violated equal protection under heightened scrutiny review); *Condemarin v. University*

*Hosp.,* 775 P.2d 348, 353–56 (Utah 1989) (court used heightened scrutiny because deference under minimum scrutiny "is inappropriate when dealing with a fundamental principle of American law that victims of wrongful or negligent acts should be compensated to the extent that they have been harmed").

In *Attorney General v. Waldron,* 289 Md. 683, 426 A.2d 929 (1981), we stated that:

"[W]hen important personal rights, not yet held to merit strict scrutiny but deserving of more protection than a perfunctory review would accord, are affected by a legislative classification, a court should engage in a review consonant with the importance of the personal right involved."

289 Md. at 713, 426 A.2d at 946. At issue was the judicial pension statute which provided that a full-time judge who retires and elects to receive a judicial pension may not thereafter practice law for compensation. This Court held that the right of a judge who was receiving a pension to resume the practice of law is an "important personal right" subject to heightened or intermediate scrutiny. We further determined that the statute violated the "equal protection component contained in both Article 24 of the Maryland Declaration of Rights and the fourteenth amendment to the United States Constitution." 289 Md. at 729, 426 A.2d at 954.

If Judge Waldron's right to resume the practice of law after accepting a pension as a retired judge is an "important personal right," I believe a maimed, disfigured, or pain-racked victim's right to recover full compensation, as assessed by a judge or jury, against the person whose tortious act caused their injury is at least as important a personal right.

In *Waldron* we also noted:

"Although the equal protection clause of the fourteenth amendment and the equal protection principle embodied in Article 24 are 'in pari materia,' and decisions applying

one provision are persuasive authority in cases involving the other, we reiterate that each provision is independent, and a violation of one is not necessarily a violation of the other."

289 Md. at 714, 426 A.2d at 946. We further stated that "because the State equal protection principle is possessed of independent animation, in other circumstances the application of Article 24 of the Maryland Declaration of Rights may require a result at variance with the Supreme Court's application of the fourteenth amendment's equal protection clause." 289 Md. at 714 n. 20, 426 A.2d at 946 n. 20.

Part of the "independent animation" of this State's equal protection principle in Article 24 can be found in Article 19 of our Constitution, which provides in pertinent part that every person "for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right ... fully without any denial ... according to the Law of the land." I believe Article 19, if nothing else, makes it clear that, in Maryland, the right to a "remedy ... fully without any denial" is significant enough to be included in our constitutional guarantees and is, at minimum, such an "important personal right" that any unequal limitation on that right should be subject to "intermediate scrutiny."

Some states have held constitutional provisions like Article 19 preclude statutory caps on damages without an alternate remedy or commensurate benefit. *See, e.g., Lucas v. U.S.*, 757 S.W.2d 687, 690–91 (Tex.1988); *Kansas Malpractice Victims v. Bell*, 243 Kan. 333, 757 P.2d 251 (1988). I agree with the majority that these cases go too far, but it would seem that the Constitution's recognition of a right to a "remedy ... fully without any denial" implies that, in Maryland, that right is an "important personal right" and its unequal deprivation is therefore deserving of heightened scrutiny.

The legislature did not treat all plaintiffs the same when deciding to limit noneconomic damages. In my opinion, they should not have treated all liability insurers the same.

There was clear evidence that there was a crisis in the availability and affordability of medical malpractice liability insurance. *See Report of the Joint Executive/Legislative Task Force on Medical Malpractice Insurance* (1985). No one has demonstrated there was a crisis, or that the cap would solve any crisis, in the availability and affordability of automobile liability insurance. The *Minority Report, Governor's Task Force on Liability Insurance* (1985) summarized the testimony before the Task Force and concluded:

> "[T]his Task Force has heard no testimony that claims experience or verdicts are the reasons for affordability and availability of insurance. Indeed, there has been *no testimony* as to the amount of insurance premium that could be saved even if all of the recommendations of this Task Force were adopted. In short, the testimony developed by this Task Force does not justify the drastic changes and the elimination of rights of innocent people and perhaps, more importantly, no testimony that even if these changes were adopted, would the problems be solved." (Emphasis in original).

*Id.* at 48–49. Unquestionably automobile insurance rates are high, but they are equally high in other states; yet few other states limit the right of automobile accident victims to recover in full their noneconomic damages. I recognize that limiting noneconomic damages of only medical malpractice plaintiffs is a further form of unequal treatment. But the information contained in the *Report of the Joint Executive/Legislative Task Force in Medical Malpractice Insurance* (1985) may justify such legislation even under the heightened scrutiny analysis and especially under the majority's rational basis analysis. Most of the cap statutes that have withstood constitutional challenges are caps on medical malpractice recovery.

In my opinion, defendants have failed to prove that Judge Murphy was incorrect in his determination that Courts & Judicial Proceedings Art., § 11–108 did not meet the heightened scrutiny test and that it was a denial of equal protection for this motor vehicle tort victim to be deprived of

$160,000 of the noneconomic damages assessed by the jury. It is ironic that this accident occurred when plaintiff's car was struck by a tractor-trailer on an interstate highway. The defendant corporation has offices in several states. We do not know in which state the defendant's tractor-trailer was registered or in which state the liability insurance policy for this truck was written. Plaintiff's loss of a portion of her noneconomic damages may, for all we know, have no effect on Maryland insurance rates or availability, but may only provide an unanticipated windfall to a national insurer who wrote an out-of-state insurance policy, but was fortunate enough to have its insured's negligence occur in Maryland.

Judge GOUDY has authorized me to state that he joins in this dissenting opinion.