FILED

02/26/2020

Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
September 4, 2019 Session

## JODI MCCLAY v. AIRPORT MANAGEMENT SERVICES, LLC

**Rule 23 Certified Question of Law
from the United States District Court
for the Middle District of Tennessee
No. 3-17-CV-0705 Eli Richardson, Judge**

_____

**No. M2019-00511-SC-R23-CV**

_____

HOLLY KIRBY, J., concurring.

I join fully in the majority's conclusion that the statutory cap on noneconomic damages enacted by our legislature does not violate either the separation of powers clause or the equal protection clause in the Tennessee Constitution. A much closer question is presented on whether the statutory cap violates the clause in the Tennessee Constitution guaranteeing a right to trial by jury. I agree with the majority's analysis and conclusion on this issue but write separately to further explain my reasoning.

In her scholarly dissent, Justice Clark explains the significance Tennessee's founding citizens placed on the right to a jury trial, putting language in the Constitution that makes the right "inviolate," and argues forcefully that the statutory cap on noneconomic damages is "a legislative usurpation of the jury's constitutionally protected fact-finding function." I agree that our founding citizens considered the right to a jury trial to be of profound importance. However, the plaintiffs in this case have not shown that the constitutional right to a jury trial was intended to protect plaintiffs from substantive legislative enactments limiting noneconomic damages.

I agree with Maryland's High Court that "the constitutional right to a jury trial is concerned with whether the court or the jury shall decide those issues which are to be resolved in a judicial proceeding." *Murphy v. Edmonds*, 601 A.2d 102, 116 (Md. 1992) (citations omitted). In holding that Maryland's statutory cap on noneconomic damages did not violate the right to a jury trial in Maryland's constitution, the Maryland Court in *Murphy* explained:

If the General Assembly had provided in [the statutory cap on noneconomic damages] that the trial judge, rather than the jury, should determine the amount of noneconomic damages or the amount of noneconomic damages in excess of $350,000, a substantial issue concerning the validity of the statute would be presented. The General Assembly, however, did not attempt to transfer what is traditionally a jury function to the trial judge. Instead, the General Assembly abrogated any cause of action for noneconomic tort damages in excess of $350,000; it removed the issue from the judicial arena. No question exists concerning the role of the judge versus the jury with respect to noneconomic tort damages in excess of $350,000. Therefore, no question concerning the constitutional right to a jury trial is presented.

*Murphy*, 601 A.2d at 117.

Maryland's interpretation is borne out by the national discussion among American revolutionaries during the time period in which Tennessee attained Statehood in 1796 and the accompanying adoption of the 1796 Constitution declaring "[t]hat the Right of trial by Jury shall remain inviolate." Tenn. Const. art. XI, § 6 (1796). During this period, "the jury represented the most effective means available to secure the independence and integrity of the judicial branch of the colonial government" and the struggle with British authorities "over jury rights was, in reality, an important aspect of the fight for American independence." Stephan Landsman, *The Civil Jury in America: Scenes from an Unappreciated History*, 44 Hastings L.J. 579, 596 (1993) [hereinafter "Landsman, *The Civil Jury in America*, 44 Hastings L.J. at __"].[1]

The arguments of those advocating a right to jury trial "centered on their belief that the courts should not become the exclusive province of the judges." *Id*. at 599.[2] The

---

[1] Participants in the First Continental Congress in 1774 protested royal administrators' acts to remove certain categories of cases to England for trial and interfere with the election of jurors; they adopted a declaration stating that the colonies were "entitled . . . to the great and inestimable privilege of being tried by their peers of the vicinage. . . ." Declaration and Resolves of the First Continental Congress, Res. 5 (1774), *available at* https://www.ushistory.org/declaration/related/decres.html.

[2] Advocates of a constitutional right to jury trial frequently cited a statement by Blackstone:

The impartial administration of justice, which secures both our persons and our properties, is the great end of civil society. But if that be entirely entrusted to the magistracy, a select body of men, and those generally selected by the prince or such as enjoy the highest offices in the state, their decisions, in spite of their own natural integrity, will have frequently an involuntary bias towards those of their own rank and dignity; it is not to be expected from human nature that the few should be always attentive to the interests and good of the many.

right to jury trial served not only as a "symbol of democracy" but also a "restraint on judicial power." *Id*. at 600.

In post-revolutionary America, the conflicts surrounding juries focused on the degree to which judges should be allowed to intrude on the jury's role. *Id*. at 597–605 (describing several such conflicts). For example, in some states during this era, juries generally "had the right to decide questions of law as well as fact." *Id*. at 602.[3] This practice had proven useful when juries helped colonists resist unfair laws foisted upon them by British authorities.[4] *Id*. at 594–95.

Demand for a more predictable justice system for the new nation eventually "led to the curtailment of the jury's power, especially with respect to the determination of law." *Id*. at 605 (citations omitted). States, including Tennessee, settled on a power-sharing arrangement, in both civil and criminal cases, in which "the judges should adjudicate finally upon the whole question of law, and the jury upon the whole question of fact." *Sparf v. United States*, 156 U.S. 51, 80 (1895) (citing *Commonwealth. v. Anthes*, 71 Mass. 185, 193 (1855)); *Hopkins v. Nashville, Chattanooga & St. Louis Ry.*, 34 S.W. 1029, 1031 (Tenn. 1896) (citation omitted) ("The jury are a body of laymen, selected by lot, to ascertain, under the guidance of a judge, the truth, in questions of fact. . . . Their province is strictly limited to questions of fact, and within that province they are still further restricted to the exclusive consideration of matters that have been proved by evidence in the course of the trial.").

As described by the Maryland Court in *Murphy*, the genesis of the right to jury trial was establishing the role of juries vis-à-vis judges. *Murphy*, 601 A.2d at 117. The right to jury trial is not implicated by the legislature's alteration of the remedies available to litigants.

---

Landsman, *The Civil Jury in America*, 44 Hastings L.J. at 599–600 (quoting William Blackstone, 3 *Commentaries on the Laws of England* 682 (1783) (Nourse Publishing Co. 1959)).

[3] *See also* John T. Nockleby, *What's a Jury Good For?* 9 n.19 (Loyola-LA Legal Studies, Paper No. 2007-15, 2005) [hereinafter "Nockleby, *What's a Jury Good For?*, at __"] (citing Leonard Levy, *The Palladium of Justice* 56–57 (1999)), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=965065 ("For more than a century bracketing the founding of the country, many authorities insisted that the jury had the right and power to determine for itself the law as well as the facts."). It is unclear whether North Carolina had this practice in the late 1700s when Tennessee became a state.

[4] *See also Sparf v. United States*, 156 U.S. 51, 89–90 (1895) (quoting Whart. Cr. Pl. (8th Ed.) § 806) (citing *Williams v. State*, 32 Miss. (3 George) 389, 396 (1856)) (explaining that indications by some "in the early history of the country" that juries could disregard the law as given by the court were likely because "in many of the states the arbitrary temper of the colonial judges, holding office directly from the crown, had made the independence of the jury, in law as well as in fact, of much popular importance.").

Respectfully, this distinction explains much of how Justice Lee's dissent goes astray. The Lee dissent cites case after case on remittitur and additur, which of course involve *judicial* actions that impact juries' factual findings. Since the constitutional right to a jury trial concerns directly whether the court or the jury will decide issues in a judicial proceeding, *of course* there are many cases cautioning that judges' undue use of remittitur and additur may contravene the Constitution. *See, e.g., Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 309 (Tenn. 2017) (citations omitted) ("To avoid contravention of the right to jury trial clauses of the federal and state constitutions, the trial court must obtain the consent of the party against whom the additur or remittitur is to be entered; if that party does not consent, the trial court must order a new trial."); *Johnson v. Nunis*, 383 S.W.3d 122, 136 (Tenn. Ct. App. 2012) (quoting *Smartt v. NHC Healthcare/McMinnville, LLC*, No. M2007–02026–COA–R3–CV, 2009 WL 482475, at *21 (Tenn. Ct. App. Mar. 10, 2011)) ("[T]he determination of such non-pecuniary losses as pain and suffering damages involves a subjective element not present in the determination of ordinary facts. *The jury trial guarantee requires that the subjective element involved be that of the community and not of judges*." (emphasis added)).

Appellate decisions indicating that a *judge's* undue limitation on a jury's damage assessment may violate the constitutional right to jury trial are of no use to determine whether the *legislature's* enactment does so, even for purpose of analogy. None of these cases elucidate how the constitutional right to jury trial, intended to limit judges' interference with juries, applies to legislative action limiting remedies available to claimants. Indeed, at least one specifically differentiates between the courts and the legislature in this regard. *See Meals v. Ford Motor Co.*, No. W2010–01493–COA–R3–CV, 2012 WL 1264454, at *23 (Tenn. Ct. App. Apr. 13, 2012) (Kirby, J., dissenting in part) ("In the absence of a basis under the law for [the majority's] remittitur, I believe that the majority's decision amounts to a policy determination, limiting the size verdict a jury may award. It may be that our Legislature can appropriately make such a policy decision, but the courts are not authorized to do so."), *rev'd sub nom. Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414 (Tenn. 2013).

Putting "[l]egal analysis aside," the Lee dissent then goes on to castigate Tennessee's legislature for enacting a statute with which the dissent disagrees based on policy. It cites statistics suitable for a legislative committee hearing and describes in vivid detail the injuries in *Meals*, cited above, as an example of how the legislature's policy choice will be unfair to such seriously injured claimants.[5]

---

[5] In my partial dissent in *Meals*, I described in detail the evidence of Billy Meals' grievous injuries, but I did not put "[l]egal analysis aside"; detailing that evidence was pertinent to the legal analysis. It demonstrated that the evidence fully supported the jury's verdict and did not support the intermediate appellate majority's significant remittitur of the jury's verdict. *Meals*, 2012 WL 1264454, at *25 (Kirby, J. dissenting in part). This Court granted permission to appeal and reversed the remittitur on that basis. *See Meals*, 417 S.W.3d 414.

4

This Court has on occasion expressed dislike for particular statutes. *See, e.g. Lavin v. Jordon*, 16 S.W.3d 362, 369–70 (Tenn. 2000) ("[W]e find that the result compelled by the statute in this case is particularly distasteful in that the plaintiffs . . . are denied the opportunity to be made whole for their loss. . . . Perhaps the General Assembly will revisit the issue of whether the statutory cap on damages contained in section 37-10-102 provides an adequate and sufficient remedy. . . ."). Importantly, this is normally done to demonstrate that this Court will uphold statutes *despite* displeasure with the legislature's policy choice. It reinforces the principle of judicial restraint, demonstrating that the Court adheres to the longstanding precept that "[T]he wisdom, or unwisdom of a statute lies solely with the Legislature and is not the concern of the Court." *Hoover Motor Exp. Co. v. Hammer*, 298 S.W.2d 724, 726 (Tenn. 1957) (citing *Davidson Cnty. v. Rogers*, 184 Tenn. (20 Beeler) 327, 331–332, 198 S.W.2d 812 (1947)).

Unfortunately, the Lee dissent does the converse. In a case in which this Court is asked to render one of the most consequential decisions any court can make—hold a statute unconstitutional—the Lee dissent first strongly advocates striking down Tennessee Code Annotated section 29-39-102 as unconstitutional, and then describes at length why the dissent disagrees with the legislature's policy decision to enact it in the first place. This sequence could give a misimpression that the two points are linked.

This Court has stated:

> A challenge to a statute's constitutionality does not give the Court a license to second-guess the General Assembly's policy judgments. . . . It is not our prerogative to inquire into the motives of the General Assembly. Nor may we review the statute's wisdom, expediency, reasonableness, or desirability. These are matters entrusted to the electorate, not the courts.

*Waters v. Farr*, 291 S.W.3d 873, 917–18 (Tenn. 2009) (citations and footnotes omitted). Admittedly, this can sometimes be a hard principle to maintain. But maintain it we must.

For all of the reasons discussed herein, I concur in the majority opinion.

_____
HOLLY KIRBY, JUSTICE

5